**ALINCO LIFE INSURANCE COMPANY**

v.

**The UNITED STATES.**

No. 77–63.

United States Court of Claims.

Feb. 17, 1967.

William A. Cromartie, Chicago, Ill., for plaintiff. Peter L. Wentz, Chicago, Ill., attorney of record. Edward W. Rothe, Patrick A. Heffernan, Chicago, Ill., Samuel H. Horne, of Hopkins, Sutter, Owen, Mulroy, Wentz & Davis, Washington, D. C., and John L. Carey of Oare, Thornburg, McGill & Deahl, South Bend, Ind., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on March 8, 1966. Exceptions to the commissioner's findings and recommended conclusion of law were filed by the defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the trial commissioner's findings, opinion and recommended conclusion of law, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is therefore entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

Commissioner Fletcher's opinion, as modified by the court,* is as follows:

In 1953, Associates Investment Company (Associates) formed the plaintiff (Alinco) as a wholly-owned subsidiary corporation and qualified it as a life insurance company under the laws of Indi-

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

ana.  The Government's subsequent attack on Alinco's status as a life insurance company for income tax purposes has spawned the present litigation.[1]

### Summary of the Facts

The facts in this novel case are set forth at length in the findings of fact below.  Here they will be summarized only to the extent necessary to explain the basis for the conclusions reached in this opinion.

Associates is one of the Nation's largest finance companies and engages for the most part in automobile financing and the making of direct personal loans.  Prior to 1953, it owned or controlled a number of subsidiary corporations, one of which was Morco Insurance Agency (Morco).  Due to Associates' inability under the laws of its corporate domicil (Indiana) to engage directly in the business of writing life insurance, Associates had formed Morco and qualified it as a licensed insurance agent in several states.

The importance to Associates of owning such a subsidiary was this.  As a large finance company, Associates occupied an exceptionally favorable position for the solicitation and procurement through some sort of a qualified subsidiary of a substantial amount of business for life insurance companies, particularly those which engaged primarily in the writing of a specialized type of life insurance known as *credit* life insurance.  Old Republic Life Insurance Company of Chicago, Illinois (Old Republic) was, and is, one of these specialized life insurance companies, and, as we shall see, it played an important role in the transactions which gave rise to the present controversy.  Before relating those facts, however, it will be an aid to understanding if, first, credit life insurance is defined and described.

The parties have stipulated that credit life insurance is single premium term insurance on the lives of debtors, with their creditors as beneficiaries, in amounts at least sufficient to discharge their indebtednesses in case of death.  Ordinarily it is sold as a part of another, and more prominent transaction, namely, a loan of money or an installment sale of tangible personal property, such as an automobile.  This connection of credit life insurance to installment borrowing and purchasing has resulted in its paralleling the spectacular growth of consumer credit generally since World War II.  It has been estimated that in recent years nearly 50,000,000 people in the United States are covered by some form of credit life insurance and that the total of such insurance in force is more than 40 billion dollars.

A credit life insurance policy may be written either as an individual policy issued directly to the insured debtor with his creditor named as primary beneficiary, or as a group policy issued directly to the creditor as beneficiary in which event the individual debtors of the creditor-policyholder will simply receive certificates of insurance.  Two types of coverage are provided, (a) decreasing term coverage, under which the amount of the death benefit decreases during the policy term coincidentally with the decrease in the amount of the debt under the applicable installment payment schedule, and (b) level term coverage, under which the amount of the death benefit remains constant during the policy term.[2]

The premium due for the entire term of the insurance must be paid at the inception of the coverage and, like some forms of group insurance, a flat rate is generally charged without inquiry as to the age, health, or medical history of the applicant.  Although there were vari-

---

1.  The present case involves only Alinco's claim for refund of Federal income taxes and statutory interest thereon amounting to $2,365,036.65 for the calendar year 1958, the years 1960 and 1961 being also involved because of net operating loss carrybacks from those years.  However, litigation is pending in the Tax Court of the

United States with respect to the tax liabilities of Alinco for the years 1953 through 1957 and of Associates for the years 1953 through 1959.

2.  Obviously, level term is particularly suitable in cases of loans repayable in a lump sum rather than by regular installments.

ances during the period here involved, the standard premium charge for decreasing term insurance was $1 per $100 of coverage, and for level term insurance it was $2 per $100 of coverage. Unlike most forms of casualty insurance, but like most life insurance, once the premium for credit life insurance has been paid so that the coverage has commenced, the insurance company cannot cancel the policy. Also, unlike casualty insurance, the insured has no right to cancel the policy simply to obtain a premium refund. He may however, cause an automatic termination of the policy through some act on his part, such as prepayment of the debt, in which event he may, or may not, receive a credit or refund, dependent upon the terms of his policy.

During the period here involved, premiums on credit life insurance were computed under the same principles as were applied generally in the life insurance industry. The "net premium" (the amount designed to cover the mortality risk) was computed actuarially from established mortality tables. To the net premium was added an amount, called "loading," resulting in a total "gross premium" charged to the insured policyholder. Essentially, the amount of "loading" is the amount designed to cover the acquisition costs, other operating expenses and profits of the insurance company.[3]

During the 1950's credit life insurance companies, such as Old Republic, incurred acquisition costs for their credit life business in the following ways: (1) by the payment of commissions to licensed insurance agents (generally amounting to about 50 percent of the premium), (2) by the payment to a policyholder of a "retrospective insurance rate adjustment" (generally under a group policy), and (3) by reinsurance of business with a subsidiary insurance company owned by the producer of the business. All three methods are involved here.

Associates and its subsidiaries were very important producers of credit life insurance business for Old Republic. Originally, Associates received its compensation from Old Republic for this business production by way of the first two methods mentioned above. Associates' subsidiary, Morco, had been appointed by Old Republic as one of its agents under an agreement whereby Morco received a minimum guaranteed commission of 50 percent on all credit life insurance business produced by Morco for Old Republic. Associates was also receiving retrospective rate adjustments from Old Republic on the several group policies held by Associates. These activities produced a good deal of income for the Associates' group.

In the early 1950's Old Republic found itself confronted with a worrisome development. Some of its important cus-

3. Obviously, there is room for competition in the life insurance industry through decreasing the amount of "loading" and thus decreasing the gross premium charge. However, due to the method by which credit life insurance is sold, a unique situation has been observed by persons knowledgeable in the industry. Since the premium for credit life insurance is generally paid by the borrower, and since the lender's remuneration is generally a percentage thereof, the higher the gross premium, the greater will be the profit to the lender who procures the policy. Therefore, some lenders (or sellers) in seeking to increase their remuneration for the procurement of such insurance tend to place their business with the insurance company that charges the highest gross premium. An experienced lender (or sell-

er) can generally foresee that, since the borrower's (or purchaser's) interest lies in the consummation of the primary transaction of loan (or installment sale), he is not likely to go out "shopping" elsewhere for a lower premium rate assuming he is interested in acquiring any credit life insurance at all. Thus, it is reasonable to anticipate that, in most instances, a borrower desiring to cover his loan with credit life insurance will consummate the entire transaction with his creditor in preference to making any independent analysis or comparison of credit life premiums available elsewhere. This situation is sometimes referred to as "reverse competition" and is one of the factors leading to the contention by some persons that premium overcharging is a common abuse in the selling of credit life insurance.

tomers had begun to press for more commission compensation from their placing of credit life business with Old Republic, and some had even formed their own credit life insurance companies to which they shifted their credit life business. To Old Republic's management this development constituted a threat to the company's future volume of credit life insurance. However, rather than accede to the demands for larger commissions and retrospective rate adjustments, Old Republic began to suggest to its more important customers that they form their own life insurance companies, as subsidiary corporations, with which Old Republic would agree to reinsure proportionate segments of its credit life insurance. Old Republic's argument in support of its suggestion was that, in return for its customer assuming part of the risk, Old Republic could afford a more generous sharing of the premium income, the end result being "more of the pot" to its customers.

Such a suggestion was made by Old Republic to Associates in the early part of 1953. For some time Associates' management had been exploring possibilities for entering the life insurance business, and they therefore expressed immediate interest in Old Republic's suggestion. Conferences and negotiations ensued between officials of the two companies,[4] and on August 3, 1953, Associates formed Alinco as a wholly-owned subsidiary and qualified it as a life insurance company under Indiana law. A reinsurance treaty was negotiated and executed between Old Republic and Alinco under the terms of which Old Republic agreed to reinsure with Alinco 18 percent of all its credit life insurance (with certain categories of risks excluded) and to pay to Alinco, as a reinsurance premium, 18 percent of the gross premiums received for such insurance. In return, Alinco agreed to reimburse Old Republic for 18 percent of the losses incurred on reinsured policies.[5] Accounts between Old Republic and Alinco were to be settled in monthly statements furnished by Old Republic to Alinco. The categories of insurance which were excluded from the reinsurance treaty were home mortgage policies, monthly outstanding balance group life policies, group life policies providing disability coverage, policies already reinsured with American United Life Insurance Company, and policies providing coverage on borrowers of certain named finance companies and banks, including borrowers of Associates and its subsidiaries.[6] The aggregate of Old Republic's credit life insurance, with the enumerated categories of risks excluded, is called herein the "Alinco Reinsurance Pool."

The Alinco-Old Republic reinsurance arrangement was typical of reinsurance arrangements generally in that Old Republic as the primary carrier handled all administrative details of the insurance including the supervision, investigation, defense against and payment of all claims, and thereafter made its claim against Alinco by way of monthly statements for Alinco's share of the losses.

Simultaneously, the prior agreements for commissions to Morco and retrospective rate adjustments to Associates had been canceled. However, Morco continued to act as Old Republic's agent in writing credit life insurance on Associates' debtors but without compensation.[7]

---

4. If written memorandum regarding these negotiations were ever prepared by officials of either company, such writings have since been either lost or destroyed.

5. The treaty was later amended on four occasions to increase Alinco's quota share. By June 1, 1958, Alinco's share had been increased to 75 percent.

6. This exclusion from the reinsurance treaty of credit life policies produced by Associates, along with all other matters relating to the formation and operation of Alinco, was the result of careful planning by Associates' operating personnel and tax advisors.

7. This was true only with respect to credit life insurance. Morco continued to receive commissions from Old Republic on the writing of credit accident and health policies.

From birth to liquidation, Alinco's only business consisted of reinsurance under the Old Republic-Alinco treaty. As might be expected from the fact that Old Republic handled the myriad details incident to the insurance contained in the Alinco Reinsurance Pool, Alinco's operations were quite simple and inexpensive. Alinco had no office or salaried employees. An accountant employed by another subsidiary of Associates took care of Alinco's books and records, examined the monthly reports from Old Republic, deposited its monthly receipts, and prepared its annual statements to the Indiana Insurance Department with the help of information furnished him by Old Republic and Alinco's consulting actuary. On the average he was able to perform these duties in the space of approximately one day each month.

Despite the simplicity of this operation, Alinco's financial success during the period 1953 through 1959 was striking. Its net gain from operations during that period, before Federal income taxes but after paying its expenses and share of death benefits, was in excess of $28,500,000. See finding 21.

Notwithstanding its financial success, Alinco's corporate existence was comparatively short-lived. In keeping with its management's desire to expand further into the life insurance business, Associates succeeded in acquiring control in 1957 of an operating old-line stock life insurance company, Capitol Life Insurance Company of Denver, Colorado. Originally, Associates planned to merge Alinco into Capitol, but in late 1957 or early 1958, it was learned that an Internal Revenue Agent intended to question Alinco's status as a life insurance company. Rather than burden Capitol with Alinco's potential tax problems, it was decided that Alinco should be liquidated. Thereupon, the Old Republic-Alinco reinsurance treaty was terminated as of November 30, 1959. While no business was reinsured after that date, Alinco continued to be responsible for its share of losses and premium adjustments on business previously reinsured, and Alinco was not liquidated until 1961.[8]

### The Section 269 Issue

Section 269(a) of the Internal Revenue Code of 1954 (formerly section 129(a) of the 1939 Code) provides, in pertinent part, that:

> If * * * any person or persons acquire * * * directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. [26 U.S.C. § 269 (1964 ed.)]

The Government contends that Associates' principal purpose in the transactions described above was tax avoidance through, first, obtaining for Alinco the special tax treatment provided for life insurance companies by the Internal Revenue Code and then channeling its profits from the sale of credit life insurance into Alinco tax-free. Such special tax treatment of life insurance companies, says the Government, is an "other allowance" within the meaning of section 269(a), supra, and, therefore, the section permits disallowance to Alinco of life insurance company status leaving it to be taxed like any ordinary business corporation but without the benefit of the $25,000 surtax exemption.

Alinco contends that section 269(a) has no relevance here and that the only issue involved is whether Alinco for the year in question (1958) met the technical requirements of section 801 of the 1954 Code defining life insurance companies. Moreover, even if section 269(a) can properly be applied to change a corporate taxpayer's status, says Alinco, the facts show that the *principal* purpose behind the formation of Alinco was a business

---

8. However, it has continued to retain its corporate status under Indiana law so that it has the capacity to maintain this suit.

purpose and not avoidance of tax. I agree with Alinco.

Few subjects in taxation have been as vexing to the courts as that of tax avoidance. There is a wealth of case material, most of it singularly unenlightening except in the context of the peculiar facts in individual cases, particularly those which "exude an odor piscatorial." Rice, Judicial Techniques in Combating Tax Avoidance, 51 Mich.L.Rev. 1021 (1953). As Randolph E. Paul once observed, the subject of tax avoidance "has virtually no philosophical pathways" and visibility is low, indeed. Paul, Restatement of Tax Avoidance, Studies in Federal Taxation, Callaghan and Co. (1937). The frustrating anarchy in the decisions is no doubt due, in part at least, to the element of subjectivity which seems inevitably to attend upon the search for a taxpayer's intention or motivation. There has resulted a rather remarkable accumulation of conveniently vague maxims, such as the substance, not the form, of a transaction must control tax incidence,[9] that an unreal or sham transaction must be disregarded, that what was actually done rather than what was said is the important criterion, that a taxpayer is privileged to reduce his taxes by means which the law permits, etc. See the discussion and numerous case citations in Rice, Judicial Techniques in Combating Tax Avoidance, supra, at p. 1026 et seq. "General propositions do not decide concrete cases," [10] however, and in the end the particular facts of this case must bear the responsibility for decision.

The Government strongly urges that Associates' only, or at least its principal, purpose in forming Alinco as a life insurance company and arranging for its reinsurance treaty with Old Republic was thereby to convert Morco's ordinary commission income and Associates' retrospective rate adjustment income into tax-free underwriting income. If this contention were factually supported, the requisite tax avoidance motive would be present to such a degree as to require a consideration of the Government's argument that section 269 may be availed of to deny a taxpayer its status acquired under other provisions of the Internal Revenue Code. However, the contention is not factually supported, and even if it were, the authorities which have considered the question in an analogous context are contrary to defendant's position here. Thus, even though the principal purpose for the formation of a Western Hemisphere Trade Corporation subsidiary was to obtain the tax benefits provided for those corporations, such motivation does not constitute tax avoidance within the meaning of the predecessor of section 269. I.T. 3757, 1945 C.B. 200.[11] To the same effect, see this court's decision in A. P. Green Export Co. v. United States, 284 F.2d 383, 151 Ct.Cl. 628 (1960) and the decision of the Tax Court in Barber-Greene Americas, Inc., 35 T.C. 365 (1960).

It seems unnecessary to elaborate the point further, since, as stated, the facts of record here will not sustain a finding of tax avoidance as the principal purpose for Alinco's formation, and hence there is nothing upon which section 269 can operate. The record is replete with business motivations of such magnitude as to make entirely subordinate any tax advantages which might be anticipated from Alinco's qualification as a life insurance company.[12]

9. Once described by Judge Learned Hand as "anodynes for the pains of reasoning." Commissioner v. Sansome, 60 F.2d 931, 933 (2d Cir., 1932).

10. Holmes, J., dissenting in Lochner v. State of New York, 198 U.S. 45, 76, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

11. The failure here to follow this analogous administrative ruling brings to mind the critical observation of a well-known tax lawyer and commentator: "If the Treasury is to behave in a responsible and mature manner, it should not say one thing in administration and then say precisely the opposite in litigation." Eisenstein, A Critical View of the Treasury, 15 N.Y.U. Inst. on Fed. Taxation 21, 24 (1957).

12. Counsel for plaintiff point to the fact that in planning the formation of a life insurance subsidiary, it cannot safely be assumed that taxation as a life insurance

Thus, while Associates had been receiving commissions and retrospective premium adjustments from Old Republic prior to 1953, there were serious disadvantages to these methods of realizing a profit from the sale and processing of credit life insurance. For example, the receipt of commissions by Associates' subsidiary, Morco, on life insurance premiums was apparently in violation of Indiana insurance law, under which corporations are forbidden to act as life insurance agents. Burns Indiana Stat. Anno., §§ 39–4601 and 39–4608. See Nichols Loan Corporation of Terre Haute v. Commissioner, 321 F.2d 905 (7th Cir., 1963). The receipt and retention of retrospective premium adjustments were also legally dangerous because of the possibility that Associates might be considered a trustee for the individual policyholders and thus obligated to pass on the premium refund of a few dollars each year on each policy to thousands of individual customers, thus entailing considerable administrative expense as well as loss of the benefit of the premium adjustment.[13] Finally, there was the danger that the receipt of either commissions or retrospective premium adjustments by Associates might be considered additional compensation for the loaning of money and, therefore, in violation of state laws governing the maximum small loan rate. Thus, there were several reasons why the commission or retrospective premium adjustment methods of compensation were unsatisfactory from the lender's standpoint.

In addition, Associates desired to increase its profits from the sale of credit life insurance. Old Republic was unwilling to increase its commission rates, but it was willing to share "more of the pot" with its finance company customers provided they in turn would share the insurance risks. To accomplish this, of course, meant that Associates would have to enter the life insurance industry, a business move it had been planning for some time anyway. Since Associates could not legally do so directly, it had to form Alinco as a subsidiary and qualify it under the Indiana law applicable to life insurance companies.

Thereupon, Associates caused Alinco to enter into the reinsurance treaty with Old Republic. And, just as management had anticipated, the transaction indirectly increased Associates' profits from its production of credit life insurance business. Alinco made several million dollars more from the reinsurance treaty than Morco would have made under the previous commission agreement, and this was true irrespective of Alinco's tax status. See finding 24.

This maximizing of profit, however, was not accomplished without risk. Under the commission arrangement neither Morco nor Associates bore any share whatever of the insurance risks, whereas Alinco was subjected by the treaty to very substantial life insurance risks which it was required by law to protect with reserves.[14]

Throughout its brief, the Government refers to Alinco as an "ostensible" life insurance company, but it is not at all clear what is intended to be inferred by

company will necessarily be beneficial. As will appear below, between 1921 and 1958, premium income was not an item of gross income to life insurance companies, but neither were their underwriting losses deductible from their investment income. Hence, it was possible that a newly formed life insurance company whose initial underwriting expenses were substantial might be forced to pay tax on its investment income despite larger underwriting losses. See statement of Edward J. Schmuck, Esquire, then General Counsel of Acacia Mutual Life Insurance Company, Hearings Before Senate Finance Committee, 86th Cong., 1st Sess., on H.R. 4245, March 3, 1959, at p. 196.

13. That this was a real threat is indicated by the fact that a number of states had regulations prohibiting the holder of a group credit life insurance master policy from retaining any refunded premiums where the borrowers had themselves paid the original premiums. See, for example, No.Car.Ins.Code, Sec. 58–44.7.

14. As of December 31, 1958, Alinco's reinsurance risk under its quota share of the policies in force in the Alinco Reinsurance Pool was $959,704,957. See finding 27.

that adjective. Nowhere is the slightest suggestion made (nor could there be) that Alinco was not legally bound to its obligations under the reinsurance treaty. Rather, the Government chooses to ignore, or at most to make light of, those obligations apparently on the ground that the risks undertaken by Alinco were mostly illusory due to the fact that the average mortality cost within a $1 premium was in the neighborhood of 28 cents. From this it is argued that credit life insurance underwriting is a highly profitable business and that, since Old Republic's financial strength was such that it had no actuarial need to reinsure any part of its policies, the normal expectation would be a refusal by Old Republic to share with anyone its profitable premium income unless there were some clever tax scheme afoot.

However, the *non sequitur* is obvious when it is realized that an insurance company's decision to reinsure is not invariably based on actuarial need. In the present case, the record shows that in the early 1950's Old Republic's management became concerned over the tendency of some of its important customers to form their own insurance subsidiaries to which they fed business formerly given to Old Republic. Realizing that, if this trend continued, Old Republic would soon be out of business, its officers suggested to some of its finance company customers, including Associates, that, if they would continue to write their credit life insurance through Old Republic, then in return Old Republic would reinsure a portion of the business with an insurance subsidiary of the finance company. This enabled Old Republic not only to maintain its profits,[15] but also to pass on some of its risk.[16]

There can be little doubt that Associates' management solicited and received expert advice with respect to all foreseeable tax problems involved in the Old Republic proposal. Surely they would be rightly subject to censure and discharge had they blindly committed Associates to an important change in the contractual arrangements with Old Republic without detailed consideration of the tax implications. No doubt they were impressed with the generally favorable tax treatment afforded to life insurance companies, and it must have been a factor in the ultimate decision. Yet, even a "major motive" to reduce taxes will not vitiate an otherwise valid and real business transaction. United States v. Cumberland Public Service Co., 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251 (1950).

Here the record is entirely persuasive that the business advantages previously discussed played the leading role throughout and that, even assuming life insurance companies were taxed as ordinary corporations, Associates would nonetheless have consummated this transaction.[17]

15. There was also a substantial advantage to Old Republic in maintaining or increasing its volume by retaining Associates' business despite the fact that the reinsurance premium paid to Alinco was the same percentage of the original gross premium as the reinsured risk. This is because the volume helped Old Republic to lower its unit cost on processing and thus contributed to its profit.

16. Although Old Republic had no pressing actuarial need to spread its risk, the possibility of unusual losses arising from disasters or war conditions was not *de minimus*. Defendant's expert witness, who had long experience with credit life insurance, testified as to some examples of such unusual losses which had adversely affected his company during his professional career.

17. The Government points skeptically at the fact that Alinco reinsured only credit life insurance whereas Associates, through Morco, was producing for Old Republic both credit life and credit accident and health insurance. No important conclusions flow from this fact. At the time involved, credit accident and health insurance was not as important as credit life insurance. Furthermore, Indiana law did not prohibit the payment of commissions to a corporate agency (such as Morco) on accident and health insurance, as it did on life insurance, so there was no necessity to change the existing commission setup to eliminate accident and health insurance. Also, it simplified accounting and regulatory problems to reinsure only credit life insurance.

In the final analysis, and from a review of the entire proceedings in this case, it·is nearly impossible to escape the impression that the Government's attack under section 269 stems, at least partially, from its conviction that Alinco is just part of a gigantic conspiracy to defraud the public. It is true that during the 1950's, credit life insurance was the subject of considerable controversy within the insurance industry itself. While there was general agreement as to the useful social function of credit life insurance, the argument was sometimes bitter over whether creditors, particularly in the fields of installment buying and small loans, were realizing exorbitant profits out of their share of allegedly excessive premium charges. See, for example, Cade, The Fundamental Issues of Consumer Credit Insurance, Insurance Law Journal, February 1955, p. 90; Mors, Consumer Installment Credit Insurance, Insurance Law Journal, May 1956, p. 299; Dunbar, Credit Insurance—Use by Licensed Lenders, Insurance Law Journal, May 1956, p. 443; Symposium on Credit Life and Credit Health and Accident Insurance (seven papers presented at the Fifth Annual Miami Insurance Law Conference), Insurance Law Journal, June 1957, pp. 327–381; and Peters, How Should Credit Life Insurance Be Regulated, Insurance Law Journal, August 1958, p. 529.

Also, in 1955, a Subcommittee of the Senate Judiciary Committee had conducted an investigation into the credit life insurance business as it was then practiced in the State of Kansas. While recognizing the "admirable function" of credit life insurance, the Subcommittee found that some loan, finance, and credit insurance companies had been guilty of unscrupulous and abusive practices in the selling and handling of such insurance. Report of the Subcommittee on Antitrust and Monopoly Legislation, U. S. Senate, 83rd Cong., 2d Sess.[18]

The foregoing studies are quite persuasive that in some areas, at least, tie-in selling of credit life insurance has been abused and exploited by unscrupulous concerns. However, except for joining most other companies in charging a premium which might be considered excessive in light of the true mortality cost, the record here does not indicate that any of the parties involved had engaged in such abusive practices. And, even if they had, it is proper to inquire what relevance such conduct would have to the resolution of a tax controversy. As the court observed in Maxwell Hardware Co. v. Commissioner, 343 F.2d 713 (9th Cir., 1965):

Taxation is peculiarly a matter of statutory law, and in applying that law to the determination and computation of income and deductions, the Courts do not make moral judgments. There is nothing perfidious or invidious in enjoying a statutory deduction from reportable income. It is not a matter of conscience but of statute and the determination of Congressional intent. [At p. 723.]

The Government's presentation of its case against Alinco has been flavored with moral and regulatory overtones. Such a sensitive concern for good business morals should not be for the Treasury. See Lilly v. Commissioner, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769 (1952) where the Supreme Court held that a deduction for kickbacks may not be dis-

---

**18.** The National Association of Insurance Commissioners was likewise investigating the abuses connected with the selling of credit life insurance and formulated a "Proposed Model Bill" for the regulation of the writing of both credit life and credit health and accident insurance. Among other things, the Model Bill restricted the amount of insurance to the amount of the indebtedness restricted the term of the insurance to the maturity date of the in-debtedness, made mandatory a refund (or credit) of premium in case of refinancing, and limited the amount of compensation which could be paid to the procurer of the insurance. Commencing in the late 1950's, the Model Bill, or similar legislation, has been enacted by a number of state legislatures. See Peters, How Should Credit Life Insurance Be Regulated, supra, pp. 531–533, and finding 34.

allowed simply because they are ethically distasteful.

■ Insofar as regulation is concerned, it is of course true that Congress frequently employs a taxing statute to achieve a non-fiscal or regulatory goal.[19] Where, however, there is Congressional intent to connect a regulatory objective to a revenue raising measure, the legislative history will always disclose that intent either directly or indirectly. See United States v. Kahriger, 345 U.S. 22, 27, 73 S.Ct. 510, 97 L.Ed. 754 (1953). The legislative history of section 269 (and of its predecessor) is barren of any suggestion that Congress intended the section to have any regulatory impact whatever on industry generally, much less on the specific business here involved.[20] Furthermore, Congress has made clear its desire that the insurance industry shall not be regulated by the Federal Government but by the several states. P.L. 15, 79th Cong., 59 Stat. 33 (1945), as amended, 15 U.S.C. §§ 1011–1015. See Dirlam and Stelzer, The Insurance Industry, 107 U. of Pa.L.Rev. 199 (1958). Insofar as a state regulatory function is concerned, this court has specifically held that the Internal Revenue Service may not employ the Federal tax laws in an effort to enforce its own concept of what state law should, or should not, be. See Kirtz v. United States, 304 F.2d 460, 157 Ct.Cl. 824, 830 (1962).

In sum then, what Associates really did in this case was to give up guaranteed commissions in return for the possibility of a greater profit through the assumption of an underwriting risk. The vehicle necessary under Indiana law to accomplish this purpose was a life insurance subsidiary (Alinco). The tax advantages which may flow from being taxed as a life insurance company were undoubtedly considered in working out this transaction, but they were secondary in importance to the business purposes and Judge Learned Hand long ago reminded us that:

> Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and al' do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant. [Commissioner v. Newman, 159 F.2d 848, 850 (2d Cir., 1947) (dissenting opinion), cert. denied, 331 U.S. 859, 67 S. Ct. 1755, 91 L.Ed. 1866.]

Alinco asks only that it be taxed like other life insurance companies. In my judgment, it is entitled to be so taxed provided only it can meet the technical statutory requirements set forth in section 801 of the Code. That remaining issue will now be considered.

### The Section 801 Issue

Before coming specifically to the statutory provision involved, a short history of life insurance company taxation in this country will be useful background. Over the years, Congress, the courts, and the Treasury, in efforts to arrive at an equitable system of taxation, have wrestled intermittently with the specialized and highly technical concepts of estimation developed by the life insurance industry.[21] See Vickrey, Insurance

19. For example, the first act of the first Congress in 1789 imposed customs duties for revenue and for "the encouragement and protection of manufactures." Act of July 4, 1789, 1 Stat. 24, Chapter 2. See, also, Chapter 39, "Regulatory Taxes," 1954 Code, and Blough, The Federal Taxing Process, Prentice-Hall, Inc., 1952, pp. 409–426.

20. For an authoritative discussion of the legislative history and the factors which led to the enactment of section 269's pred-

ecessor, see Rudick, Acquisitions to Avoid Income or Excess Profits Tax: Section 129 of the Internal Revenue Code, 58 Harv.L.Rev. 196 (1944). The Senate and House Committee Reports are reproduced in 1944 C.B. 901 et seq.

21. Curiously by today's standards, life insurance was once regarded as a "blasphemous attempt to estimate man at a price." See Oppenheimer, Proceeds of Life Insurance Policies Under the Federal Estate Tax, 43 Harv.L.Rev. 724

Under the Federal Income Tax, 52 Yale L.Jour. 554, 575 (1943).

Prior to 1921, insurance companies had been taxed according to the same scheme as ordinary corporations. Accordingly, they were taxed not only on investment income but also upon premium income with a special deduction being allowed for the net addition to reserve funds required by law. See Mertens, Law of Federal Income Taxation, Sec. 44.01. It was soon recognized, however, that in the case of life insurance companies, the inclusion of their premium receipts in gross taxable income was "one of the faultiest parts of the income tax act."[22] Fundamentally, this was because premium receipts, in the words of the Supreme Court, "were not true income but were analogous to permanent capital investment." Helvering v. Oregon Mutual Life Ins. Co., 311 U.S. 267, 269, 61 S.Ct. 207, 208, 85 L.Ed. 180 (1940). See, also, National Life Ins. Co. v. United States, 277 U.S. 508, 48 S.Ct. 591, 72 L.Ed. 968 (1928) and Massachusetts Mut. Life Ins. Co. v. United States, 56 F.2d 897, 74 Ct. Cl. 162 (1932).

By the Revenue Act of 1921, Congress established special systems of taxation applicable to insurance companies alone, and with some modifications these systems have prevailed to this day. The rules thus set forth in 1921 differed somewhat dependent upon the particular type of insurance company involved.

Insofar as life insurance companies were concerned, the 1921 Act embodied the concept that premium receipts are not true income because such a large part of them must be reserved and set aside to meet future death claims. Accordingly, the Act made a life company taxable only on its investment income (interest, dividends, and rents), and premium income was excluded from the computation of its net income subject to tax. Furthermore, recognizing that interest

earned on the reserved portion of premiums was an integral part of the life insurance reserve, a special deduction was allowed for a percentage of the "reserved funds required by law" (4 percent in the 1921 Act, but varied in subsequent Acts). The effect was that life insurance companies were taxed only on that portion of their income from investments which exceeded the amount of assumed interest necessary to build up their reserves for future death claims. This system is known as the "investment income" approach to the taxation of life insurance companies.

Casualty insurance companies, on the other hand, were taxed on their underwriting income, as well as their investment income. This meant that premiums were included in gross income, although a deduction was allowed for the net increase in unearned premiums during the year. Furthermore, in determining "underwriting income," a deduction was allowed for "losses incurred," which meant losses paid during the year plus the net increase in "unpaid losses" outstanding at the end of the year. Revenue Act of 1921, c. 136, 42 Stat. 227, § 246(b) (5) & (6).

Since life companies were taxed differently from casualty companies, it became necessary to define what constituted a life insurance company and the following definition was adopted in section 242 of the Act:

> when used in this title the term "life insurance company" means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.

Dr. T. S. Adams, then Tax Advisor to the Treasury Department, explained the

---

(1930). Cf. the Supreme Court's more enlightened approach in Burnet v. Wells, 289 U.S. 670, 681, 53 S.Ct. 761, 77 L.Ed. 1439 (1933).

22. Dr. T. S. Adams, then Tax Advisor to the Treasury Department, so advised the Senate Finance Committee. Senate Hearings on H.R. 8245, 67th Cong., 1st Sess., p. 83 (1921).

rationale of the 50 percent qualification formula as follows:

> Some companies mix with their life business accident and health insurance. It is not practicable for all companies to disassociate those businesses so that we have assumed that if this accident and health business was more than 50 percent of their business, *as measured by their reserves,* it could not be treated as a life insurance company. On the other hand, if their accident and health insurance were incidental and represented less than 50 percent of their business we treated them as a life insurance company. [Emphasis supplied.] [23]

Thus, it was the character of an insurance company's business *as measured by its policy reserves* that served as the touchstone for the definition of "life insurance company."

By 1940, court decisions had established that, insofar as the qualification formula was concerned, accident and health reserves maintained with respect to policies providing combined life, accident and health coverage, were considered to be the same as life reserves. Therefore, once a company, by reason of the reserve test, had qualified as a life company, it could obtain a deduction for the statutory assumed interest on all of its technical insurance reserves (as opposed to its ordinary liability reserves) whether pertaining to life policies or to accident and health policies. See, for example, Helvering v. Oregon Mut. Life Ins. Co., supra, and Commissioner v. Monarch Life Ins. Co., 114 F.2d 314 (1st Cir., 1940). Not long after these decisions, the Congress commenced its consideration of the Revenue Act of 1942 in the course of which the existing definition of life insurance companies was reviewed, particularly with respect to that part of the definition dealing with health and accident insurance.

The result was a revision of the definition to accommodate the difference between cancellable and noncancellable health and accident policies. In contrast to the casualty aspects of *cancellable* health and accident policies, it was recognized that the writing of such insurance in *noncancellable* form bore a close analogy to life insurance.[24] Said the Senate Committee on Finance:

> Technical changes are made to distinguish in a clearer manner the types of insurance contracts included and to emphasize the fact that the unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are included for purposes of the definition of a life insurance company only. Since noncancelable contracts of health and accident insurance require the accumulation of substantial reserves against increased future risks, the writing of such insurance is analogous to life insurance and the definition has been changed to permit such companies to be taxed as life insurance companies. The unearned premiums and unpaid losses on noncancelable life, health, or accident policies, not included in life insurance reserves, are added to such reserves in determining whether a company is to be considered a life insurance company. The life insurance reserves defined in subsection (c)(2) as they pertain to noncancelable health and accident insurance policies are those amounts which must be reserved, in addition to unearned premiums, to provide for the additional cost of carrying such policies in later years when the insured will be older and subject to greater risk and when the cost of carrying the risk will be greater than the premiums then being received. As the term is used in the industry, a noncancelable insurance policy means a

---

23. Hearings before the Senate Committee on Finance, 67th Cong., 1st Sess., on H.R. 8245, p. 85 (1921).

24. The analogy had been previously noted by the First Circuit Court of Appeals in Massachusetts Protective Ass'n v. United States, 114 F.2d 304, 311 (1st Cir., 1940).

contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the unearned premium must be carried to cover the renewal obligation. In view of the fact that classification as a life insurance company depends upon whether certain reserves comprise more than 50 percent of its total reserves, the term "total reserves" is defined. This will make it easier to determine whether an insurance company can qualify as a life insurance company.

\* \* \* \* \* \*

Section 201(c) (2) is new and defines the term "life insurance reserves." The definition is substantially that contained for many years in the regulations with the addition that the reserves must be based on recognized mortality or morbidity tables, the health and accident reserves must be noncancelable, and unpaid loss reserves on such health and accident contracts are included if computed on a discount basis. [S.Rep.No.1631, 77th Cong., 2d Sess. (1942–2 C.B. 504 at pp. 611–612).]

As this legislative history shows, a revision of the life insurance company definition to accommodate reserves on noncancellable health and accident insurance meant that Congress had to take into account the difference in the traditional methods of reserving for life policies as contrasted to health and accident policies. While life insurance reserves were computed from recognized mortality tables, health and accident reserves were computed on the basis of pro rata unearned premiums and unpaid losses actuarially estimated.[25] The dichotomy was resolved by section 201(b) of the 1942 Act, 56

Stat. 798, 867, redefining a life insurance company (in pertinent part) as:

an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), *or noncancellable contracts of health and accident insurance,* and the life insurance reserves \* \* \* plus *unearned premiums and unpaid losses on noncancellable life, health, or accident policies not included in life insurance reserves,* of which comprise more than 50 per centum of its total reserves. [Emphasis supplied.]

Thus, for the first time there was included in the definition of a life insurance company the casualty insurance terms "unearned premiums," "unpaid losses," and "noncancellable." It is entirely clear that this was done only because the formula was being reshaped to take into account reserves on noncancellable health and accident policies which were reserved on an unearned premium and unpaid loss basis. The legislative history indicates no other purpose for the use of these casualty terms and, particularly, no intent to change the preexisting definition as it applied to a life insurance company writing only life insurance, such as Alinco.

Insofar as the issues in this case are concerned, the 1942 definition of a life insurance company, together with its qualification formula, has remained unchanged. The definitional section enacted in 1942 became known as section 201(b) of the 1939 Code which, in turn, became section 801 of the 1954 Code with no change in substance. See Mertens, Law of Federal Income Taxation, Sec. 44.18. Likewise, although the Life Insurance Company Income Tax Act of 1959 [26] made some dramatic changes in the concept of life insurance company

---

25. A full discussion of these reserves is contained in Commissioner v. Monarch Life Ins. Co., supra, 114 F.2d at pp. 320–323.

26. P.L. 86–69, 86th Cong., 1st Sess., approved June 25, 1959, applicable retroactively to taxable years beginning after December 31, 1957.

taxation,[27] it made no changes in the definition of "life insurance company" or of "life insurance reserves" which have any relevance to this case. Therefore, the above described considerations which gave rise to the 1942 definition are all relevant to a determination of Alinco's qualification under the present section 801 of the 1954 Code, as amended. Insofar as pertinent here, section 801 reads as follows:

(a) *Life Insurance Company Defined.*—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves, comprise more than 50 percent of its total reserves (as defined in subsection (c)).

(b) *Life Insurance Reserves Defined.*—

(1) In general.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident

insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

(2) Reserves must be required by law.—

\*    \*    \*    \*    \*    \*

(c) *Total Reserves Defined.*—For purposes of subsection (a), the term "total reserves" means—

(1) life insurance reserves,

(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

(3) all other insurance reserves required by law.

The Government takes the threshold position that Alinco is not even an "insurance company" and that, therefore, it is not necessary to reach the question of its qualification as a life insurance company under the formula prescribed by section 801. Very little time need be devoted to this argument, for it flies in the face of defendant's own regulations. Section 1.801-3(a) (1) of the Regulations (26 C.F.R. § 1.801-3(a) (1)) provides:

The term "insurance company" means a company whose primary and predominant business activity during the taxable year is the issuing of insurance or annuity contracts *or the reinsuring of risks underwritten by insurance companies.* Thus, though its name, charter powers, and subjection to State insurance laws are significant in determining the business which a company is authorized and intends to carry on, it is the character of the business actually done in the taxable year which determines whether a company is taxable as an insurance company under the Internal Revenue Code. [Emphasis supplied.]

---

27. Probably the most significant change was a modification of the "investment income" approach. In general, the 1959 Act combined a tax on investment income with a tax on one-half of underwriting income and provided for a tax on the remainder of the underwriting income as and when distributed to stockholders. For a full description, see Mertens, supra, Sec. 44A.01, et seq.

Here the fact is indisputable that Alinco's *sole* business activity was the "reinsuring of risks" under its reinsurance treaty with Old Republic. Those risks during the year involved aggregated nearly one billion dollars for which Alinco was required by law to maintain reserves backed by a substantial deposit of securities with the Indiana Insurance Department, a very real business obligation which is simply ignored throughout defendant's brief.

It is true, as defendant argues, that Alinco reinsured only with one primary carrier from which Alinco received business because that carrier in turn received business from Alinco's parent, that the primary carrier handled all the administrative details of the insurance, and that Alinco's operation was therefore an extremely simple one with very little general operating expense. But it is in the nature of any reinsurance arrangement that the reinsurer's operation will tend to be a simple one since the primary carrier typically does all the work. The important fact from the standpoint of a reinsurer, such as Alinco, is the assumption of risks funded by reserves. This Alinco clearly did, and that is all the statute and regulations require. The principal question, therefore, is not whether Alinco was an insurance company but whether it was a *life* insurance company under the technical qualification formula contained in section 801.

The parties are in full agreement that the qualification formula in section 801 may be expressed in terms of the following fraction, the quotient of which must be more than 50 percent in order for an insurance company to qualify as a life insurance company:

| *Qualifying reserves* (numerator) | ÷ | *Total reserves* (denominator) |
|---|---|---|
| 1. Tabular [28] reserves on life, annuity, and noncancellable accident and health policies | | 1. Tabular [28] reserves on life, annuity, and noncancellable accident and health policies |
| 2. Unearned premiums on noncancellable life, health, or accident policies not included in (1) | | 2. Unearned premiums not included in (1) |
| 3. Unpaid losses on noncancellable life, health, or accident policies not included in (1) | | 3. Unpaid losses not included in (1) |
| | | 4. All other insurance reserves required by law. |

The parties further agree that the only real difference between the components of the numerator and the denominator which is important here is that all *nontabular unearned premiums* and *unpaid losses* are included in the denominator but not in the numerator unless they are maintained with respect to *noncancellable* life, health, or accident policies. Alinco contends that, since it admittedly reinsured *only* life insurance policies, it is impossible under traditional insurance concepts for it to have any such thing as "unearned premiums" or "unpaid losses." Alternatively, it says that, even if it be deemed to have "unearned premiums" and "unpaid losses," they related *only* to "noncancellable life * * * policies"

28. "Tabular" reserves, as the name suggests, are simply the reserves for future unaccrued claims on life, annuity, and noncancellable accident and health policies which are computed "on the basis of recognized mortality or morbidity tables and assumed rates of interest." See section 801(b) (1), supra.

and thus were includible in both the numerator and the denominator.

In my opinion, Alinco is clearly correct in its basic contention. Its *only* insurance reserve was its tabular life insurance reserve computed on the basis of the Commissioner's 1941 Standard Ordinary Mortality Table (a recognized table), with a two percent assumed rate of interest which reserve was set aside to pay future claims arising from the life insurance contracts issued by Old Republic and reinsured by Alinco.[29] Since Alinco's life insurance reserve goes into both the numerator and the denominator of the qualifying fraction, and since there were no other reserves to go into either the numerator or the denominator, Alinco's qualifying reserves, of course, were 100 percent of its total reserves.

Defendant insists, however, that *credit* life insurance (the only type of insurance reinsured by Alinco) is a creature apart. While agreeing that it resembles life insurance in that it is payable on death, defendant argues that it more closely resembles casualty insurance in that a flat premium rate is charged regardless of age or medical history.[30] Therefore, the argument goes, even though the casualty term "unearned premium" may have no application to ordinary life insurance, it does have application to *credit* life insurance and is well understood in that industry. Consequently, in applying the section 801 qualification formula to Alinco, it is necessary, says defendant, to go to the records of the primary carrier (Old Republic) and construct therefrom the "unearned premiums" in the Alinco Reinsurance Pool by a simple mathematical proration of the original gross premium according to how much of the policy term had elapsed at the time of valuation.[31] The record in this case simply will not sustain defendant's position.

In the first place, there was general consensus among the experts who testified at the trial that credit life insurance is properly defined as specialized single premium term life insurance. Indeed, it was so stipulated by the parties in pretrial proceedings. It is well known, of course, that life insurance policies take many forms ranging all the way from a simple term life policy to exceedingly

---

**29.** Alinco's life insurance reserve was accepted by the Indiana Insurance Department and, also, by the Illinois Insurance Department as a part of Old Republic's reserves. The method of computing these reserves is described below in findings 35 through 38. Under the reinsurance treaty, Alinco was required to maintain such reserves as might be found necessary by experience, but in no event less than $2.64 per $1,000 of reinsurance in force under the treaty, since that was the reserve factor used by Old Republic in computing its own reserves.

**30.** Cf. Commissioner v. Noel Estate, 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965) where one of the principal questions was whether the proceeds of flight accident insurance (which, of course, is issued at a flat premium rate regardless of age or medical condition) were includible as life insurance in decedent's gross estate for estate tax purposes despite the casualty nature of such insurance. The Supreme Court accepted the Government's position that such insurance was includible in the taxable estate because it was "on the life of the decedent." Sec. 2042, 1954 Code.

**31.** The Government's request for this data confounded Old Republic's personnel. Since Old Republic maintained its life insurance reserves on a tabular basis, it kept its accounting records on the same basis. Therefore, the information desired by the Government as to premiums and unexpired terms was available only from original sources, such as the policies themselves. To extract the accurate data from those sources involved a cost of over $100,000 which neither Old Republic nor the Government was willing to bear. In an effort to accommodate the Government, but with an appropriate *caveat*, Old Republic's comptroller furnished some rough estimates from which the Internal Revenue Service erected a schedule that turned out to be largely hypothetical. See finding 41, infra. At this point, no doubt, the Government shared the view of Professor Spencer L. Kimball that " * * * a curious thing about the insurance business—a business that necessarily deals statistically with great masses of information—is the large amount of relevant and useful information that is not accessible." Book Review, 63 Mich.L.Rev. 1509 (June 1965).

complicated life policies with a myriad of fringe benefits. But throughout all such contracts the one thing that distinguishes life insurance from casualty insurance is the ultimate eventuality insured against, namely death.[32] This is the *only risk* insured against by credit life insurance, and it is therefore properly defined as life insurance.

In the second place, in its efforts to apply the "unearned premiums" concept to credit life insurance, defendant would have the court ignore the entire legislative history behind the inclusion of the term in what is now section 801. As demonstrated above, when in 1942 Congress first added the term to the definition section for life insurance companies, it had in mind *solely* a revision of the formula to include as qualifying reserves "unearned premiums" and "unpaid losses" on noncancellable *health and accident policies* which, historically, were treated in the industry as casualty-type coverage. There is nothing to indicate that, by the addition of those terms, Congress meant to imply that there are any such things either as "unearned premiums" or "unearned premium reserves" with respect to life insurance policies such as those reinsured by Alinco.

The testimony of Alinco's expert actuary, Arthur C. Eddy, is entirely persuasive that these technical terms refer primarily to casualty-type insurance and are rather meaningless in pure life insurance. For example, if a life insurance actuary were to hear the term "unearned premiums," in his mind he would simply equate it to the tabular life insurance reserves.[33] This is because what the unearned premiums reserve is to the casualty insurance company, the tabular life insurance reserve is to the life insurance company. As was observed long ago in Travelers Equitable Insurance Co., 22 B.T.A. 784, 789 (1931):

> We think it clear that the term "unearned premiums" has a fixed and definite meaning in respect to life insurance *as the net value of the policies computed according to the accepted actuarial rules* employed under section 3302 of the Minnesota Statutes *in computing petitioner's reserve in respect to its life policies*. We do not find this term used in any other sense in life insurance business * * * [Emphasis supplied.]

It is well established that the technical provisions of section 801 (and its predecessors) were couched by Congress in language peculiar to the insurance industry and therefore intended to have the meaning generally attributed thereto by the experts. See Mertens, supra, Sec. 44.15, in particular, footnote 11. As was said by the late Mr. Justice Frankfurter in his article "Some Reflections on the

---

32. This is not to say, of course, that some casualty insurance does not insure against death. The point is that it also insures against many other evitable hazards, such as fire, theft, etc., whereas life insurance, particularly term life insurance, has the sole function of protecting against death. See Nash, Federal Taxation of Life Insurance Companies, Matthew Bender & Co. (1965), Secs. 2.03, 2.04.

33. In this connection it is instructive to refer to the classic textbook on life insurance, Huebner and Black, Life Insurance, Appleton-Century-Crofts, 5th Edition (1958). When the reader examines the index for "unearned premium," he is simply referred to the chapter dealing with life insurance reserves. And, as might be expected from Mr. Eddy's testimony, nowhere in the chapter does the term "unearned premiums" even appear. Further, see p. 6 of the text where it is stated that in life insurance the "unearned premium is called the policy reserve." Perhaps this concept had its genesis in the holding of Lord Mansfield long ago that, once the risk has attached under a contract of insurance, the premium has been earned, and no part thereof is returnable absent an agreement to the contrary. Tyrie v. Fletcher, Cowp. 666, 668. The rule thus laid down seems never to have been questioned. See Mailhoit v. Metropolitan Life Ins. Co., 87 Me. 374, 32 A. 989 (1895). This has been the law in Alinco's domiciliary state for many years. Continental Life Ins. Co. v. Houser, 111 Ind. 266, 12 N.E. 479 (1887) and Metropolitan Life Ins. Co. v. McCormick, 19 Ind.App. 49, 49 N.E. 44 (1898).

Reading of Statutes," 47 Col.L.Rev. 527, 536–537 (1947):

> If a statute is written for ordinary folk, it would be arbitrary not to assume that Congress intended its words to be read with the minds of ordinary men. If they are addressed to specialists, they must be read by judges with the minds of the specialists.
>
> \* \* \* \* \* \*
>
> Words of art bring their art with them. They bear the meaning of their habitat whether it be a phrase of technical significance in the scientific or business world, or whether it be loaded with the recondite connotations of feudalism. \* \* \* The peculiar idiom of business or of administrative practise often modifies the meaning that ordinary speech assigns to language. And if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.

Accordingly, since to life actuaries the term "unearned premiums" (to the extent it has any meaning in life insurance) is the equivalent of the tabular reserve, and since Alinco's tabular reserve equaled 100 percent of its total reserves, Alinco meets the qualification requirements of section 801.

Defendant contends, however, that the foregoing principles are inapplicable to *credit* life insurance and, in support of the contention, points to the fact that in some of the group policies in the Alinco Reinsurance Pool, Old Republic itself had provided for termination of the policy "upon repossession of the collateral, in which event the *unearned premium* shall be credited to the account of the debtor."[34] [Emphasis supplied.] This is proof, says defendant, that in a *credit* life context the term "unearned premi-

um" does have significance. This is no doubt true. Indeed, the record discloses that, particularly in recent years, some credit life insurance companies have elected, as permitted by local law, to use an unearned premium reserve instead of a tabular reserve. See findings 33 and 34, infra. This is done with the idea of providing for instances where their credit life policies, or state statutes, require a refund or credit of part of the prepaid premium to the creditor-policyholder or debtor in the event of termination of the insurance coverage prior to the scheduled maturity date of the indebtedness.

However, the important point to remember here is that neither Old Republic nor Alinco elected to reserve on an unearned premium basis but, in fact, maintained their reserves on the traditional tabular basis. So long as credit life insurance is life insurance and, therefore, not required to be reserved on an unearned gross premium basis (like accident and health insurance), the mere fact that sometimes a refund of premium is given or required cannot serve to change the proper reserve basis from tabular to unearned premium either for insurance accounting purposes or for the purpose of the statutory qualification formula.[35]

Furthermore, in computing Alinco's qualification ratio, defendant compounded its error. The "unearned premiums" which it used in developing the denominator of the fraction were unearned *gross* premiums. That this was erroneous, even under defendant's theory, is shown by the following definition contained in section 1.801–3(e) of the Treasury Regulations:

> (e) Unearned premiums. The term "unearned premiums" means those amounts which shall cover *the cost of*

---

34. The record does not show what portion of the total Pool was made up of such group policies, nor was any effort made by defendant to segregate them in its computation of Alinco's qualification ratio.

35. At most, the refund possibility is a contingent liability for which some reserve

in addition to the mortality reserve should be established. And defendant's expert witness testified that *today* the commonest method of reserving for credit life insurance is to add to the mortality reserve "a little loading" to cover the refund contingency.

*carrying the insurance risk* for the period for which the premiums have been paid in advance. Such term includes all unearned premiums, whether or not required by law. [Emphasis supplied.]

It is entirely clear that "the cost of carrying the insurance risk" is the net, not the gross, premium. And, in the case of life insurance, the net (or "risk") premium is the tabular reserve. Hence, if defendant's computation be corrected in this regard, there is no question that Alinco met the qualification test [36] even on defendant's theory that credit life insurance carries an "unearned premium."

The basic fallacy underlying defendant's position on this aspect of the case is even demonstrated by its own illustration. It concludes its brief to the commissioner as follows:

If a borrower who paid $2 for a two-year level term credit life policy after one year prepaid his loan and cancelled the insurance, he would not accept kindly a refund of only 30 cents, the amount needed as a reserve for mortality. He would expect to get back $1, the full unearned portion of the premium. This is basically the Government's position. If in such situation the amount "unearned" as of the end of the year is $1, the Service's computations are correct, and plaintiff does not qualify under Section 801 as a life insurance company in either 1958, 1960 or 1961.

It is not at all apparent, under the assumed circumstances, why any fairminded policyholder "would expect to get back $1." As the record shows, in the selling of credit life insurance, the gross premium of $2 was subject to a standard commission, or acquisition cost, of about 50 percent. This means, of course, that from the $2 premium, the insurance company received only $1. Hence, a refund to the prepaying borrower of $1 would mean he had received life insurance coverage for one year without the insurance carrier having received any premium at all. Why, therefore, should the insured "expect to get back $1?"

Finally, one can accept *arguendo* all of defendant's theories with respect to the existence of unearned premiums and unpaid losses in the case of *credit* life insurance, and Alinco must still prevail. This is because any such "unearned premiums" or "unpaid losses" were maintained by Alinco on *noncancellable* life insurance policies. As such, they go into the numerator as well as the denominator of the qualifying fraction, and Alinco's percentage thus remains at 100.

It is clear from the legislative history discussed above that the phrase "noncancellable life, health, or accident policies" was intended to refer only to health and accident coverage. This is in accord with the understanding of the insurance industry, for the record is clear that there is no such thing as a *cancellable* life insurance policy and that the cancellable-noncancellable distinction has significance only in an accident and health insurance context. That the Treasury Department itself shares that understanding is illustrated by section 1.801–3(c) of the Regulations reading, in pertinent part:

(c) Noncancellable life, health, or accident insurance policy. The term "noncancellable life, health, or accident insurance policy" means a *health and accident contract, or a health and accident contract combined with a life insurance or annuity contract,* which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premiums (as defined in paragraph (e) of this section) must be carried to cover that obligation.[37] *Such a health and accident contract* shall

---

36. On defendant's computation for the year in issue, using *gross* unearned premiums, Alinco failed to meet the reserve-ratio test by only nine-tenths of one percent. See finding 41.

37. In the case of noncancellable or guaranteed renewable accident and health insurance, something must be added to the unearned premium for anticipated future premium deficiencies. However, no com-

be considered noncancellable even though it states a termination date at a stipulated age, if, with respect to the *health and accident contract,* such age termination date is 60 or over. *Such a contract,* however, shall not be considered to be noncancellable after the age termination date stipulated in the contract has passed. [Emphasis supplied.]

Notwithstanding this general understanding, defendant maintains again that what may be true with respect to *ordinary* life insurance is not necessarily true with respect to *credit* life insurance. It does appear that in recent years, apparently by reason of statutory enactments patterned after the NAIC Model Bill, some credit life policies have been written providing specifically for "cancellation" and a refund of "unearned premium." See finding 34 footnote 13.

The fact remains that no such policies were contained in the Alinco Reinsurance Pool. Those credit life policies were not cancellable at the option of either the insurer or the insured during the term for which they were written. Since the term of a credit life insurance policy in the Pool was usually made coextensive with the contractual term of the related indebtedness, it was possible for the life insurance coverage to *terminate* prior to the term for which the policy was originally written, as, for example, if the debt was paid prior to its maturity date. The possibility that such prepayment might occur, however, could hardly be considered a *right of cancellation* since in such event the insurance coverage was terminated by the policy itself. Such termination is not, therefore, the result of the exercise of any right of cancellation granted by the policy to *either the insurer or insured.* It is true that the master group policies in the Alinco Rein-

surance Pool were specifically made cancellable at the option of either the insurer or the creditor-policyholder upon proper notice, but such cancellation could *only* be effected with respect to future debtors who would otherwise have come under such master policy. These policies did not give the insurer or the creditor-policyholder the right to cancel the credit life insurance coverage already in existence prior to cancellation.[38]

Furthermore, with the exception of the clause in group decreasing term policy Number RP 387, which provides that the insurance will be terminated "upon repossession of the collateral, in which event the unearned premium shall be credited to the account of the debtor," none of the policies in the Pool contained provisions requiring the insurer to refund or credit any part of the prepaid premium to the creditor-policyholder or to the debtor upon termination of the coverage prior to the original maturity date of the indebtedness. In fact, it will be noted that group decreasing term policy Number RP 134 provides that "No refund shall be made by the Company by reason of the prepayment of any loan."

Thus, even if Alinco can be said to have had "unearned premiums" and "unpaid losses" under the literal interpretation given those phrases by defendant, they were on "noncancellable" life insurance policies and, therefore, they should be included in the numerator as well as the denominator of the qualifying fraction. When this is done, it is admitted that Alinco's reserve-ratio is 100 percent and hence it clearly qualifies as a life insurance company under section 801.

Accordingly, in my opinion, Alinco is entitled to the refund claimed, the exact amount of which should be determined pursuant to Rule 47(c).

---

parable additional reserve is required in the case of life insurance (whether term or level premium) because the factor for future premium deficiencies is an integral part of the actuarial tables on the basis of which the mortality reserve is computed.

38. Insofar as the individual credit life policies in the Pool are concerned, their provisions disclose no event or condition which would serve to terminate the policy other than death of the insured or the expiration of the original term stated therein.