ASSOCIATES INVESTMENT COMPANY, ALLEGED TRANSFEREE OF THE PROTECTIVE LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1426–69.   Filed December 20, 1972.

*William A. Cromartie, Patrick A. Heffernan,* and *Peter B. Freeman,* for the petitioner.
*Rex A. Guest,* for the respondent.

### OPINION

SIMPSON, *Judge:* The respondent determined that the petitioner was liable as transferee for deficiencies in the income tax of the Protective Life Insurance Co. as follows:

| Year | Deficiency | Year | Deficiency |
|---|---|---|---|
| 1958 | $200,589.67 | 1961 | $338,490.63 |
| 1959 | 156,645.21 | 1962 | 76,142.43 |
| 1960 | 212,785.62 | 1966 | 471.28 |

The issues in this case have been severed, and the only issue to be decided herein is whether consents executed by an officer of Protective, subsequent to—but within 2 years after—its dissolution, were

valid and extended the period of limitations on assessments against Protective.

All of the facts have been stipulated, and those facts are so found.

Associates Investment Co., the petitioner, is a corporation which maintained its principal place of business in South Bend, Ind., at the time of filing its petition in this case.

In 1962, the petitioner acquired all of the stock of the Protective Life Insurance Co. (Protective), a Nebraska corporation. On December 7, 1964, the board of directors of Protective adopted a plan of liquidation and dissolution, and the petitioner, as owner of all the outstanding stock of Protective, executed a unanimous consent to the plan of liquidation on December 8, 1964. The plan provided that it was the intent of Protective to dissolve and that Protective would discontinue the active conduct of its business on December 17, 1964, and wind up its affairs.

On March 31, 1966, Protective transferred all of its assets to the petitioner. A statement of intent to dissolve was filed with the secretary of state of Nebraska on April 13, 1966, and on April 14, 1966, such statement was recorded in Douglas County, Nebr. On April 21, 1966, Protective filed its articles of dissolution with the secretary of state of Nebraska, and the secretary issued a certificate of dissolution, which was recorded on April 22, 1966, in Douglas County, Nebr. Beginning on May 3, 1966, notice of Protective's dissolution was published once each week for 3 successive weeks in a legal newspaper printed in Omaha, Nebr.

Protective had previously filed a Form 966 (corporate dissolution or liquidation) with the Internal Revenue Service on or about January 7, 1965. Attached to this form was a copy of Protective's plan of liquidation. Protective had also filed its 1964 Federal income tax return, on or about September 17, 1965, and attached to this return a statement that Protective had adopted a plan of liquidation and a copy of such plan. On or about August 17, 1966, Protective filed its final return, and this return included the statement that pursuant to the previously filed plan, Protective was liquidated on March 31, 1966.

In 1961, the respondent commenced an audit of the Federal income tax returns of Protective for the years 1958 through 1960. The audit proceedings were suspended in 1964 pending the decision in *Alinco Life Insurance Co.* v. *United States*, 373 F. 2d 336 (Ct. Cl. 1967). Both Alinco Life Insurance Co. and Protective were wholly owned subsidiaries of the petitioner, and the respondent and the representatives of Protective believed that the decision in the *Alinco* case might provide a basis for resolving the questions posed in a 10-day letter which had been sent to Protective in 1963 concerning its tax

liability for the years 1958 through 1960. While the outcome of the *Alinco* case was awaited, Mr. R. F. Lindquist, as vice president and comptroller of Protective, executed consents for the extension of the period for the assessment of income tax deficiencies against Protective. In 1963 and 1964, he executed consents with respect to the years 1958 through 1960; in 1965, he executed consents with respect to the years 1958 through 1961; in 1966, he executed consents purporting to extend the period of assessment until June 30, 1967, with respect to the years 1958 through 1962; and in 1967, he executed consents purporting to extend the period to December 31, 1967, with respect to the years 1958 through 1963. In the absence of the 1966 and 1967 consents, the period for assessment of income tax liabilities against Protective for the years 1958 through 1962 would have expired on or before June 30, 1967, and for the year 1963 on August 17, 1967. When Mr. Lindquist signed the consents in 1966 and 1967, he signed as vice president of Protective, but he was also vice president and comptroller of the petitioner. After the *Alinco* decision, the respondent took the position that such decision was not dispositive of the Protective controversy, and an officer of the petitioner notified the respondent that Protective would execute no additional consents.

The respondent issued his notice of liability to the petitioner on December 30, 1968. Prior to that time, the respondent had not issued a notice of deficiency to Protective; nor had he issued either a 10-day or a 30-day letter to either Protective or the petitioner, except for the 10-day letter he issued to Protective in 1963.

The notice of liability sent to the petitioner was untimely, unless the consents executed by an officer of Protective in 1966 and 1967 after dissolution of the corporation were valid and extended the periods for assessing the deficiencies. Therefore, the validity of such consents is the issue that we must decide.

At common law, the dissolution of a corporation terminated its legal existence: Corporate debts were extinguished, undistributed corporate realty reverted to its grantor, corporate personalty escheated, and the corporation could not sue or be sued. See Ballantine Corporations, sec. 312 (1946); Lattin, Corporations, sec. 176 (2d ed. 1971); 16A Fletcher, Cyclopedia of Corporations, sec. 8113 (1962). However, equity, through the application of the trust fund doctrine, permitted defrauded creditors to reach the assets of the former corporation (16A Fletcher, *supra* sec. 8159; Lattin, *supra* sec. 176), and ultimately every State enacted dissolution statutes which generally provided for a limited extension of the corporate existence beyond the time of dissolution. See 16A Fletcher, *supra* sec. 8166; 2 O'Neal, Close Corporations, sec. 9.28 (1971).

Since Protective was a Nebraska corporation, the parties have agreed that the issue of whether one of its officers was authorized to execute the consents must be determined by Nebraska law. See *Title Co.* v. *Wilcox Bldg. Corp.*, 302 U.S. 120 (1937). The Nebraska statutes relating to the powers of a business corporation and its officers are based on the Model Business Corporation Act (MBCA). Compare Neb. Rev. Stat. secs. 21–2081 through 21–20,104 (1970)[1] with MBCA secs. 82 through 105. Under Nebraska law, after the corporate decision to dissolve is made (secs. 21–2081—21–2083), the corporation files a statement of intent to dissolve with the secretary of state. Sec. 21–2084. Following such filing, "the corporation * * * [ceases] to carry on its business, except insofar as it may be necessary for the winding up thereof." Sec. 21–2085. During this winding-up period, the corporation is to notify its creditors and, "after paying or adequately providing for the payment of all its obligations," distribute the remainder of its assets to its shareholders. Sec. 21–2086. Following the distribution, the corporation files its articles of dissolution. Sec. 21–2092. The secretary of state then issues a certificate of dissolution, and the existence of the corporation ceases "except for the purpose of suits, other proceedings and appropriate corporate action by shareholders, directors and officers as provided in sections 21–2001 to 21–20,134." Sec. 21–2092; see MBCA sec. 93. The issuance of the certificate does:

not take away or impair any remedy available to or against such corporation, its directors, officers, or shareholders, for any right or claim existing, or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within two years after the date of such dissolution. Any such action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name. The shareholders, directors and officers shall have power to take such corporate or other action as shall be appropriate to protect such remedy, right or claim. * * * [Sec. 21–20, 104; see MBCA sec. 105.]

Since the outcome of this case turns on whether the officers of Protective had the power to execute the consents in 1966 and 1967 under Nebraska law, we must construe the Nebraska law and attempt to carry out its purposes as if we were a Nebraska court. *Commissioner* v. *Estate of Bosch*, 387 U.S. 456, 466 (1967). We should also recognize that our interpretation of the Nebraska law will affect parties in a variety of other circumstances and that our decision will not be confined to cases involving the Federal tax laws. On the one hand, we recognize that the purposes of the Nebraska statutes were to establish procedures for the dissolution of corporations that will enable the shareholders to bring about a timely completion of the affairs of the corporation. On the other hand, we also perceive that the claim of a

---

[1] All statutory references are to the Neb. Rev. Stat., unless otherwise indicated.

creditor should not be dismissed lightly, and that we should favor a construction of the statute which protects the claim of a creditor, if it can be done without frustrating the other purposes of the statute. See *United States* v. *Village Corp.*, 298 F. 2d 816 (C.A. 4, 1962); *Eastman, Gardiner & Co.* v. *Warren*, 109 F. 2d 193 (C.A. 5, 1940); *Helvering* v. *South Penn Oil Co.*, 68 F. 2d 420 (C.A.D.C. 1933), reversing on other grounds 20 B.T.A. 1180 (1930).

The words of section 21–2092 raise a question as to whether the officers of a dissolved corporation have powers to act under various provisions of the chapter relating to business corporations. Such section provides that upon dissolution the corporation terminates, "except for the purpose of suits, other proceedings and appropriate corporate action by shareholders, directors and officers as provided in sections 21–2001 to 21–20,134." However, the comment to the corresponding Model Business Corporation Act section states that upon the issuance of the certificate of dissolution, the corporate existence ceases except as provided in section 105 of the Model Act, the equivalent of section 21–20,104. Model Bus. Corp. Act Ann. 2d, secs. 92 and 93, par. 2 (1971). We assume that when Nebraska enacted its provisions based on the MBCA, it must have been aware of that statement of the draftsmen of the MBCA and that such statement therefore constitutes a part of the legislative history of the Nebraska provision. Based upon such legislative history, we conclude that the broad language of section 21–2092 relating to the powers of a dissolved corporation was intended to refer only to the powers set forth in section 21–20,104.

Section 21–2086 provides that prior to dissolution a corporation need not pay all of its debts—it is sufficient if the corporation makes provision for the payment of such debts; therefore, the provision clearly contemplates that after dissolution, the officers of the dissolved corporation will have to act in order to carry out the arrangements made for the payment of debts after dissolution. Nevertheless, since section 21–20,104 deals explicitly with the claims that survive the dissolution of a corporation and the powers of the dissolved corporation·to act with respect to such claims, it seems clear that section 21–2086 should be interpreted in a manner consistent with section 21–20,104. Clearly section 21–2086 should not be interpreted to provide broader powers than those authorized by section 21–20,104 in which the legislature dealt specifically with the powers of a dissolved corporation. Cf. *Duerfeldt* v. *State Game and Park Commission*, 184 Neb. 242, 166 N.W. 2d 737 (1969); *In re McCleery's Estate*, 162 Neb. 563, 76 N.W. 2d 459 (1956); *Application of Abler Transfer, Inc.*, 161 Neb. 378, 73 N.W. 2d 667 (1955).

As we understand section 21–20,104, it provides clearly that claims by or against a corporation shall survive its dissolution; and the officers of the dissolved corporation may act to protect the interests of the corporation in any surviving claim by or against the corporation. By these provisions, the legislation preserves a claim which is not settled or satisfied during the winding-up period, and the officers of the dissolved corporation are authorized to take any action appropriate to protect the interests of the corporation in a surviving claim by or against the corporation. Clearly, the language does not restrict the officers to bringing suits or responding to suits. Compare *Laning* v. *National Ribbon & Carbon Paper Mfg. Co.*, 40 F. Supp. 1005 (N.D. Ill. 1941), modified on jurisdictional grounds 125 F. 2d 565 (C.A. 7, 1942) (involving an Illinois statute which was similar to the MBCA, but which did not include the sentence granting the shareholders, directors, and officers the "power to take such corporate or other action as shall be appropriate to protect such remedy, right or claim.") The language is broad enough to authorize such actions as the employment of counsel to prepare for a suit or the making of an agreement in anticipation of a suit. See *Ross* v. *Venezuelan-American Independent Oil Pro. Ass'n, Inc.*, 230 F. Supp. 701 (Del. 1964); *Ross* v. *Mayflower Drug Stores*, 12 A. 2d 569 (Pa. 1940). Yet, in the interest of providing the shareholders with a means of completing the dissolution process within a reasonable time, the section limits the time within which the corporation may be sued. If the dissolved corporation is to sue or be sued, the suit must be commenced within 2 years after dissolution; the dissolved corporation cannot be sued in a suit commenced more than 2 years after dissolution. See *Badger Materials, Inc.*, 40 T.C. 1061 (1963); *Wheeler's Peachtree Pharmacy, Inc.*, 35 T.C. 177 (1960); *Columbia River Orchards, Inc.*, 15 T.C. 253 (1950); *First Bond & Mortgage Co.*, 21 B.T.A. 1 (1930).

In this case, the respondent commenced an audit of Protective's Federal income tax returns in 1961. In December 1964, Protective decided to dissolve, and between that time and April 1966, it was engaged in the winding-up process. Yet, the respondent's claim was not settled during that period, because both Protective and the respondent thought that it might be unnecessary to litigate the matter; they thought that the decision in *Alinco Life Insurance Co.* v. *United States*, 373 F. 2d 336 (Ct. Cl. 1967), might be dispositive of the issue, and so they knowingly put over the matter until after the dissolution of Protective. After the dissolution of Protective in April 1966, the officers of Protective had to decide whether to execute additional consents. If they had refused to do so, the respondent, in order to protect his position, would have been required to issue a notice of deficiency on or before June 30 of that year, and to protect

the corporation against the commencement of litigation which it was hoped would be unnecessary, the officers of Protective decided to execute the additional consents. In 1967, when the earlier consents were about to expire, the parties were discussing whether the *Alinco* decision was in fact dispositive of the issue. If the officers of Protective had not agreed to execute additional consents, the respondent would have had to send out a notice of deficiency immediately, and litigation would have been commenced. To avoid what was still hoped to be unnecessary litigation, the officers of Protective again agreed to execute additional consents. The consents executed in both 1966 and 1967 were thus done in order to protect the interests of Protective. They did not purport to extend the time for suing Protective beyond the 2-year period after dissolution.

Although a suit was not commenced against Protective within 2 years after its dissolution, we cannot believe that it was the intent of the draftsmen of the MBCA and the Nebraska legislation to hold that the actions of the officers were not authorized for that reason. In an opinion in the *Badger Materials* case, this Court construed a similar statute literally and held that since a suit was not commenced against the dissolved corporation within such 2-year period, the officers of the corporation had no power to act with respect to a claim that survived dissolution. *Badger Materials, Inc.*, 40 T.C. 725 (1963). However, that opinion was subsequently withdrawn (40 T.C. 1061 (1963)), and the consequences of such a literal interpretation of the statute convince us that it could not have been intended by the draftsmen. Cf. *United States* v. *Village Corp., supra* (in which a strict literal interpretation of a statute was not followed so as to permit a creditor to sue a dissolved corporation). To hold that the officers of a dissolved corporation have no authority to act unless a suit is commenced against the corporation within 2 years after dissolution would have the effect of preventing the settlement of any claim after dissolution. For example, the officers could not employ legal counsel or could not make other arrangements in anticipation of the possibility of a suit, for if they settled the matter without suit, such actions would then be unauthorized. Compare *Ross* v. *Venezuelan-American Independent Oil Pro. Ass'n, Inc., supra; Ross* v. *Mayflower Drug Stores, supra*. Similarly, contrary to the obvious implication of section 21–2086, the officers could not complete predissolution arrangements to pay a debt without the necessity of a suit. Such results would be without reason and clearly arbitrary and surely were not the purpose of the legislation Furthermore, under the New Mexico and Virginia statutes, it is apparent that a corporate officer may act after dissolution with regard to claims against the corporation (N.M. Stat. Ann. sec. 51–29–24 (1971); Va. Code Ann. sec. 13.1–101 (1964)), and the annotations to the MBCA indi-

cate that the only difference between such statutes and the MBCA is the time during which suit must be commenced. Model Bus. Corp. Act Ann. 2d, sec. 105, par. 3.02 (1971). For these reasons, we conclude that the failure to commence an action against Protective within the 2-year period after dissolution is no cause to find that the officers lacked the authority to execute the consents, and we hold that the execution of such consents was an appropriate action to protect the interest of Protective and that such action was, therefore, authorized under section 21–20,104.

Since a suit was not commenced against Protective within the 2-year period after its dissolution, one could not be commenced against it. However, inasmuch as we have found that the officers of Protective had the power to execute the consents, it is then sufficient for us to conclude that a notice could have been sent to Protective at any time prior to December 31, 1967. It matters not that a notice was in fact not sent to Protective during such period or at any time. Under the Federal law, the respondent had 1 year after the time in which it could have sent a notice of deficiency to Protective to send a notice to the petitioner as transferee of Protective, and its notice to the petitioner was issued within such 1-year period. Sec. 6901(c), I.R.C. 1954.

Because of our conclusion that the officers of Protective had the authority under section 21–20,104 of the Nebraska statutes to execute the consents in 1966 and 1967, we need not deal with the respondent's arguments that the dissolution of Protective was ineffective because of certain technical defects or that the petitioner is estopped from denying the validity of the consents because of its position as a shareholder in Protective.

Reviewed by the Court.

> *The parties are directed to move or otherwise act with respect to further proceedings in this case on or before February 14, 1973.*

---

DAWSON, *J.*, concurring: I agree with the result in this case for the reasons expressed by Judge Simpson. I was the author of the opinion in *Badger Materials, Inc.*, 40 T.C. 725 (1963), subsequently withdrawn in 40 T.C. 1061 (1963). Justice Frankfurter said in *Henslee* v. *Union Planters Bank*, 335 U.S. 595, 600 (1949), "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." I now believe that the literal interpretation I gave to the statute in *Badger Materials* was wrong, and I will not compound the error.