The CENTRAL NATIONAL LIFE INSURANCE COMPANY OF OMAHA

v.

The UNITED STATES.

No. 194–70.

United States Court of Claims.

April 19, 1978.

Patrick A. Heffernan, Chicago, Ill., for plaintiff; William A. Cromartie, Chicago, Ill., attorney of record. Richard Bromley, Chicago, Ill., Francis O. McDermott, Washington, D. C., Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., of counsel.

Herbert Grossman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Judge Kenneth R. Harkins with directions to make findings of fact and recommendation for conclusion of law. The trial judge has done so in an opinion and report filed on February 23, 1977. Exceptions to the trial judge's findings and recommended conclusion of law were filed by the defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the trial judge's findings, opinion, and recommended conclusion of law, with modification by the court, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

Trial Judge Harkins' opinion, as modified by the court,* is as follows:

In this tax refund case, The Central National Life Insurance Company of Omaha contests the determination by the Internal Revenue Service (IRS) that the company did not qualify as a life insurance company for federal income tax purposes.[1] Plaintiff seeks to recover income tax principal in the amount of $9,063.26 and interest in the amount of $1,889.25 paid for the taxable year ended December 31, 1964.

Substantially all of plaintiff's business, in the year 1964, consisted of the issuance of life insurance policies and health and accident disability coverages incidental to such life insurance. In 1964, most of plaintiff's premium income was derived from credit life insurance and related credit health and accident coverages.[2] In *Alinco*,[3] this court

---

\* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 134(h).

1. The Internal Revenue Code of 1954, as amended, defines a life insurance company as follows:

   "*§ 801. Definition of life insurance company.*
   "*(a) Life insurance company defined.*
   "For purposes of this subtitle, the term 'life insurance company' means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

   "(1) its life insurance reserves (as defined in subsection (b)), plus
   "(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves, comprise more than 50 percent of its total reserves (as defined in subsection (c))."

2. Plaintiff's total premium income from life insurance was $2,988,119, of which 62 percent, or $1,855,403, was derived from credit life policies; accident and health insurance premium income was $1,314,404, of which 55 percent, or $723,046, was derived from credit A&H policies.

3. *Alinco Life Ins. Co. v. United States,* 373 F.2d 336, 178 Ct.Cl. 813 (1967).

concluded that an insurance company that specialized in the reinsuring of credit life insurance could qualify under section 801, provided it met the 50 percent test.

In the *Alinco* case, the life insurance policies involved were single premium term insurance, with an average term of 2 or 3 years, on the lives of debtors with the creditor as beneficiary. Reserves for the credit life insurance involved in the *Alinco* case were computed on the customary tabular basis for life insurance reserves—from recognized mortality tables and assumed rates of interest.[4] This case differs in that Central National presents a further problem on the method used to compute life insurance reserves and its effect on eligibility for inclusion in the numerator of the qualification fraction. Plaintiff utilized the gross unearned premium method to compute its reserves for its credit life insurance policies.

Although the broad legal issue to be decided is whether plaintiff was a life insurance company under the qualification formula in section 801(a) of the Internal Revenue Code of 1954, as amended, and, although the IRS has challenged plaintiff's treatment of a number of its reserves for both its life policies and its accident and health policies,[5] proper characterization of the credit life reserves in this case is the central and dispositive issue.[6] Reserves for

the credit accident and health coverage written by plaintiff, in comparison, would not affect one way or another plaintiff's qualification as a life insurance company in 1964. The 1963–64 mean amount of plaintiff's reserves for life policies and contracts (net of reinsurance) was a total of $3,059,041 and for health and accident policies (net of reinsurance) was a total of $1,296,697. The mean amount of plaintiff's credit life insurance reserves in dispute for 1964 is $1,292,566, when computed on the gross unearned premium basis. If all other contested issues were resolved in defendant's favor, inclusion of plaintiff's credit life reserves in the numerator of the qualification fraction would confirm plaintiff's life insurance company status for 1964.[7]

*Facts.*

Plaintiff incorporated on April 29, 1953, in Nebraska as a capital stock legal reserve life insurance company. It is a wholly owned subsidiary of The Central National Insurance Company of Omaha, a casualty insurance company prohibited by law from writing life insurance. At all relevant times, plaintiff was licensed by the Director of Insurance of the State of Nebraska to engage only in the life insurance, annuities, and accident and health insurance business.[8]

4. *Id.* 373 F.2d at 351, 178 Ct.Cl. at 839, 875.

5. The June 27, 1968, statutory notice of deficiency (26 U.S.C. § 6212) asserted a deficiency of $486,862.39 for 1958, a deficiency of $161,625.25 for 1959, and a deficiency of $187,976.10 for 1960, in addition to the deficiency for 1964, at issue in this case. All deficiencies were based on determinations that plaintiff did not qualify as a life insurance company in the relevant years.

6. Plaintiff's 1963–64 Annual Statements included 16 categories of reserves; two life policy reserves and seven accident and health policy reserves are in dispute, as follows:

Credit life policies: *Mortality reserves* (mean amount $1,292,566) and *disability benefits —active lives* (mean amount $151,928).

Accident and health policies: *Morbidity reserves,* credit policies (mean amount $949,275); *morbidity reserves,* cancellable policies (mean amount $41,315); *disability benefits —disabled lives,* credit policies (mean amount $213,432);

*group contingency* (Missouri mass hazard, mean amount $107,386).

Policy and contract claims: *Noncancellable A&H* (mean amount $8,767); *cancellable A&H* (mean amount $189,582).

7. Total reserves for 1964 result in a denominator of $4,478,902; credit life reserves at $1,292,566, when combined with $1,467,222 in reserves not in dispute, would make the numerator $2,759,788, or 61.6 percent; and even without a downward adjustment in the denominator, credit life reserves at $911,010 (plaintiff's computation at 130 percent of tabular) would make the numerator $2,378,232, or 53 percent.

8. Plaintiff was authorized to write the following types of insurance as described in subsections (2) and (3) of § 44–201, Reissue, Neb.Rev. Stat.:

"(2) LIFE INSURANCE—Upon lives of persons, including endowments and annuities, and every insurance pertaining thereto and disability benefits;

During 1964, plaintiff was licensed to transact its insurance business in every state of the United States except New York and Massachusetts.

Exclusive of federal employees' group life insurance on which no reserves were required, plaintiff sold four basic types of life insurance and established reserves thereon: (1) individual life insurance; (2) employee group life insurance; (3) credit individual term life insurance; and (4) credit group life insurance. The credit group life policies insured the lives of debtors of the group policyholder, a financial institution. In general, the amount of life insurance coverage was equal to the balance of the unpaid debt and the term was coextensive with the term of the debt, which would normally vary from 6 months to 5 years. The credit group life policies provided that no insurance would be granted on the life of any debtor whose indebtedness to the group policyholder was repayable over a period exceeding 60 months; the average initial term was approximately 20 months. Credit group life policies were either single premium term insurance or monthly premium renewable term insurance.

Plaintiff's credit individual term life policies were for a term coextensive with the term of the insured's debt, which varied from 6 months to as much as 5 years, with an average term of coverage of approximately 20 months. The amount of life insurance coverage was approximately equal to the unpaid balance of the principal of the related indebtedness. In all cases, a single premium was paid in advance for the entire term of the coverage.

With respect to both credit group and credit individual term life insurance policies, plaintiff reserved no right to cancel or otherwise terminate any coverage subsequent to the payment of premiums, within the terms for which they were written.

With respect to its individual and group credit life insurance policies, plaintiff established reserves, as required by the applicable Nebraska insurance laws, to liquidate future unaccrued death claims. Each of plaintiff's credit life policies required that plaintiff establish a life insurance reserve computed in accordance with one of the following recognized mortality tables:

(a) American Experience Table, with 3 percent interest per annum;

(b) Commissioners' 1941 Standard Ordinary Mortality Table, with 3 percent interest per annum; or

(c) Commissioners' 1958 Standard Ordinary Mortality Table, with 3 percent interest per annum.

Rather than compute its credit life reserves in accordance with the mortality tables specified in plaintiff's credit life policies, however, plaintiff utilized the gross unearned premium method of computing these reserves. This method was acceptable to the Insurance Department of the State of Nebraska.

The reserves computed by plaintiff, pursuant to the gross unearned premium method of computation, were never less than those which would have been computed on the basis of the mortality tables specified in plaintiff's credit life policies. Utilization of the gross unearned premium method of computation produced a reserve, with respect to plaintiff's individual and group credit life policies for the beginning and end of 1964, in the mean amount of $1,292,566. At trial, plaintiff's evidence showed that the appropriate mortality table computation, adjusted to meet the 130 percent requirement of the Illinois Insurance Department, would have produced a reserve for its credit life policies for 1964 in the mean amount of $911,010, or 70.5 percent of the amount computed on the gross unearned premium basis. Defendant contends plaintiff's credit life reserves, if computed on a tabular basis at 100 percent of the amount thus computed rather than at 130 percent, would have been in the mean amount of $700,777, or 54 percent of the amount computed on the gross unearned premium basis.

"(3) SICKNESS AND ACCIDENT INSURANCE—Against loss or expense resulting from the sickness of the insured, or from bodily injury or death of the insured by accident, or both, and every insurance pertaining thereto, including quarantine."

Plaintiff, at least since 1957, had used the gross unearned premium method to compute reserves for its credit life policies. At the time plaintiff started to use the gross unearned premium method, the only type of life insurance plaintiff wrote was credit life insurance. Although plaintiff had the statistical detail required to calculate mortality reserves on computer cards and tapes, plaintiff did not have a computer program that would have enabled it to calculate reserves for its credit life policies on the basis of mortality tables. It was more convenient and economical for plaintiff to apply the computer program that was maintained by associated companies that were writing casualty insurance, which companies computed the gross unearned premium reserve through the application of the Rule of 78 formula.[9]

Plaintiff's use of the gross unearned premium method to compute its reserves on its credit life policies was known by the examiners for the Insurance Department of the State of Nebraska and was acceptable to the Nebraska insurance regulators. Many credit life insurance companies, in addition to plaintiff, used the gross unearned premium method, rather than mortality tables, to compute credit life reserves. The gross unearned premium method produced reserves which approximated those which would have been produced through the use of mortality tables.

All of the states have adopted the standard form developed by the National Association of Insurance Commissioners (NAIC) for the use of insurance companies in their annual financial reports. This standard form is known as the NAIC Convention Blank or the Annual Statement. Life insurance companies are required to file both their Annual Statements and their annual income tax returns on the basis of the calendar year; December 31 is referred to as the "valuation date" for the particular year involved.

In its Annual Statements for 1963 and 1964, plaintiff reported credit life reserves in exhibit 8 (Aggregate Reserve for Life Policies and Contracts), part A (Life Insurance), under the label "American Experience—2½% Net Level." To the extent that this label designated a precise computation, it was incorrect because it did not reflect that the gross unearned premium method actually was used. The Nebraska insurance examiners, however, were aware of plaintiff's method of computation and were not misled by the label. Plaintiff's Annual Statement was submitted with its tax returns to the Internal Revenue Service. Plaintiff did not inform the IRS that the label used to identify its credit life reserves was incorrect and the IRS, at the time of filing, apparently was not informed of plaintiff's actual method of computation.

On January 11, 1963, the Insurance Department of the State of Illinois, a state in which plaintiff wrote a small portion of its credit life insurance,[10] issued a letter that permitted "All Companies Writing Credit Life Insurance" to establish reserves on their credit life business on the basis of 130 percent of the appropriate mortality table.[11]

**9.** Under the Rule of 78 or "sum-of-the-digits" method, the unearned premium is computed by applying changing fractions each year (or month) to the premium paid by the insured. The numerator of the fraction changes each year (or month) to a number which corresponds to the sum of the digits of the remaining unexpired term of the policy, and the denominator, which remains constant, is the sum of all the years' (or months') digits corresponding to the entire term of insurance coverage. For plaintiff's credit term life premiums which were paid in advance for the entire term (approximately 2 years on the average) of coverage, the unearned premium computation was as follows: A premium paid on July 1, 1964, to cover a 1-year monthly installment debt would be 57/78 earned at the end of 1964 and plaintiff would set aside the remaining 21/78 as part of its reserve to satisfy future unaccrued death claims arising out of its credit term life contracts.

**10.** In 1963, plaintiff's life insurance premiums from Illinois business was approximately 5.4 percent of plaintiff's total business, less reinsurance ceded.

**11.** The letter with respect to credit life reserves stated in part:

"The reserve for outstanding balance, level term advance premium and decreasing term

There is no evidence that plaintiff's determination to utilize the gross unearned premium method of calculating its reserves for its credit life insurance in 1963 and 1964 resulted from this directive from the Illinois Insurance Department.[12] At the time this letter was issued, however, the Illinois Insurance Department had jurisdiction over plaintiff as a company doing business in Illinois and plaintiff was included in the classification of companies to which the letter was addressed. There is no evidence that the method plaintiff actually used in 1963 and 1964 to compute its gross unearned premium reserves included computations which were based upon 130 percent of the appropriate mortality table.

Plaintiff had no computer program prior to 1968 by which it could calculate its credit life reserves on the basis of mortality tables and assumed rates of interest. As a consequence, in its annual examinations, plaintiff did not submit any mortality reserve computations for verification or approval to the Nebraska insurance examiners. In 1968, plaintiff obtained from Fidelity Bankers Life Insurance Company, which had become affiliated with plaintiff in 1967, a computer program which Fidelity used to calculate mortality reserves on credit life, accident and health, and disability insurance. This computer program was used by plaintiff to apply actuarial formulae to raw data on its own policies which had been accumulated and placed on computer cards in 1963 and 1964 to generate plaintiff's Annual Statements. Plaintiff's access to the new computer program enabled it to calculate what the reserves for 1964 would have been if

based upon the American Experience, the 1941 Commissioners' Standard Ordinary, or the 1958 Commissioners' Standard Ordinary tables of mortality. In these computations, plaintiff included the 130 percent factor of the mean of the tabular reserves.

According to plaintiff's witnesses, the computer program obtained by plaintiff from the Fidelity Bankers Life Insurance Company has been in use since 1968 to calculate plaintiff's current life reserves on a tabular basis. Since 1968, examiners from the Nebraska Insurance Department have been able to verify plaintiff's mortality reserves for credit life insurance as calculated by the use of this computer program, and plaintiff's method of calculation has been accepted by the examiners.[13]

*Qualification.*

To qualify as a life insurance company for federal income tax purposes, plaintiff must show that its credit life policy reserves, although computed as gross unearned premium reserves in the manner customarily employed for casualty insurance instead of for life insurance, are life insurance reserves as defined in the Internal Revenue Code of 1954, as amended. The historical development of the function and content of life insurance reserves, for federal tax purposes, provides perspective on the meaning of the statutory definition.

Since 1921, insurance companies have been divided into three income tax categories: life insurance companies, mutual insurance companies, and other insurance (principally stock casualty) companies.[14]

---

advance premium plans of credit life insurance shall be computed on the basis of the appropriate mortality table except that the reserve for credit life insurance written on the decreasing term advance premium plan shall amount to 130% of the amount thus computed on the basis of the appropriate mortality table.

"Companies shall maintain separate records for each of its foregoing plans of credit life insurance written by them and the reserves for each plan shall be separately computed. In the event such segregation of business is not accurately maintained, the reserve for all credit life insurance written by any company shall be

computed on the basis of 130% of the appropriate mortality table."

12. In fact, plaintiff had been computing its credit life reserves on the gross unearned premium basis since at least 1957.

13. At trial, plaintiff did not establish that the computer program, as it is currently being used, is identical in application for the year in suit; or that the information available for verification with regard to current years is the same as that for the year in suit.

14. Currently, tax provisions relating to insurance companies are in subchapter L of the

Life insurance companies receive certain tax benefits over other insurance companies and are distinguished from the other categories of insurance companies by the proportion their life insurance reserves bear to all other reserves required by law.[15]

In the Revenue Act of 1921, life insurance companies were taxable only on that part of investment income derived from the difference between the statutory assumed rates of interest and the going rates of interest; casualty insurance companies, on the other hand, were taxed on both underwriting income and investment income.[16]

In the 1921 act, a "life insurance company" was one whose reserve funds for its life insurance and annuity contracts (including contracts of combined life, health, and accident insurance) comprised "more than 50 per centum of its total reserve funds."[17]

Use of the 50 percent formula permitted an insurance company to qualify as a life insurance company even though a substantial part of its business was the sale of health and accident insurance, a casualty-type coverage. Once a company had satisfied the 50 percent qualification formula, it obtained a deduction in the amount of the statutory interest on all of its technical insurance reserves for both its life policies and its accident and health policies.

Contract terminology and actuarial concepts differ in life insurance from casualty insurance. In life insurance, the premium is considered to be wholly earned when paid, and since a life policy is noncancellable by the insurer or insured, no provision need be made for premium refunds. In casualty insurance, however, the premium, although paid in advance, is "earned" only for the expired term for which insurance protection has been provided; the "unearned" premium is the portion the insurer has not had time to earn. Both parties have cancellation rights, and reserves must be maintained to cover premium refunds. The casualty insurance industry traditionally determined its reserve requirements on the basis that the full amount of the premiums would have to be refunded if all policies in force were simultaneously canceled.[18]

Life insurance reserves are computed from recognized mortality tables and as-

---

code: life insurance companies, 26 U.S.C. §§ 801–20; mutual insurance companies, 26 U.S.C. §§ 821–26; and other insurance companies, 26 U.S.C. §§ 831–32.

**15.** A concise summary of the development of life insurance company income taxation in the 1921 and the 1942 Revenue Acts is set forth in *Alinco Life Ins. Co. v. United States, supra* note 3, 373 F.2d at 345–49, 178 Ct.Cl. at 831–836. *See also Commissioner v. Monarch Life Ins. Co.,* 114 F.2d 314, 319–25 (1st Cir. 1940).

**16.** From 1921 through 1957, life insurance companies were completely exempt from tax on their underwriting income, and currently may defer half of their underwriting income. *See* 26 U.S.C. § 802(b)(2); *Economy Fin. Corp. v. United States,* 501 F.2d 466, 475–77 (7th Cir. 1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425, *rehearing denied,* 421 U.S. 922, 95 S.Ct. 1590, 43 L.Ed.2d 790 (1975).

The relationship of underwriting income and investment income in life companies and casualty companies was described in *Economy Finance* as follows:

"There are two possible sources of income for life insurance companies, from underwriting and from investment. Underwriting income is derived from the excess of gross premiums over expenses and mortality experience. Investment income is derived from the opportunity to invest the long term policy reserve. When the gross premium is calculated, the interest factor at which the policy reserve is required by the regulatory authority to be maintained is employed. This factor is less than normal investments generally return. The company looks at this differential as a source of income.

"For insurance companies other than life, no such long term reserve is required, because the probability of the occurrence of the event insured against remains constant over time; no residual benefit (e. g., death benefit, annuity) is contracted for. Once the promised protection has been granted, the premium is fully earned. [Footnote omitted.] Thus, when the gross premium is calculated, the short term opportunity to invest unearned premium reserves is not considered significant. Consequently, underwriting income is the primary source of income. * * *" *Id.* at 474.

**17.** Revenue Act of 1921, ch. 136, § 242, 42 Stat. 261.

**18.** *See Penn Sec. Life Ins. Co. v. United States,* 524 F.2d 1155, 1158, 207 Ct.Cl. 594, 600–01 (1975), *aff'd,* 430 U.S. 725, 97 S.Ct. 1440, 52 L.Ed.2d 4 (1977).

sumed rates of interest on the valuation premium, and the loading factor for administrative expenses is excluded. Casualty insurance reserves are calculated on the basis of gross unearned premiums, which include loading charges, and on the basis of unpaid losses.[19]

In the Revenue Act of 1942, Congress, to permit noncancellable health and accident insurance reserves to qualify as life insurance reserves, amended the definition of a life insurance company so as to incorporate terms historically associated with the casualty insurance business. Revision of the life insurance company definition to accommodate reserves on noncancellable health and accident insurance resulted in a blurring of the traditional differences in the methods for reserving for life policies as contrasted to those for casualty-type health and accident policies. For the first time, the life insurance company definitions included the casualty insurance terms "unearned premiums," "unpaid losses," and "noncancellable."[20] In addition, Congress added to the definition the provision that life insurance reserves are amounts based on "recognized mortality or morbidity" tables.[21] The changes made in 1942 in the definition of a life insurance company and in the qualification formula are incorporated in the 1954 Code with no change in substance. The Life Insurance Income Tax Act of 1959 made no change in the relevant definitions in section 801, and the definitions and terminology of the 1942 act are controlling.

The statutory terms culminating in code section 801 are the product of a long history of development in statutory and case law. The requirement that life insurance reserves be "required by law," for example, stems from an act of 1909.[22] The analogy of noncancellable health and accident insurance to life insurance, in the necessity to accumulate substantial reserves against increased future risks, had been noted by the courts prior to the 1942 act.[23] The section 801 definitions encompass efforts to accommodate changing industry practices and developing actuarial concepts with the gloss of prior judicial decisions and to combine the mixture with static principles of income taxation. As a result, the section 801 definitions embody an idiom peculiar to a specialized business and administrative practice and ambiguities that stem from draftsmanship by accretion. The definitions combine the "labyrinthine composition" of the tax law with the "mystic processes" in life insurance reserves; they were not "written for ordinary folk."[24]

The numerator of the qualification fraction—reserves that satisfy the requirements of the life insurance business—is defined in section 801(b).[25] All reserves so defined are "life insurance reserves."

19. See Commissioner v. Monarch Life Ins. Co., supra note 15, 114 F.2d at 320–23; Alinco Life Ins. Co. v. United States, supra note 3, 373 F.2d at 348, 178 Ct.Cl. at 835.

20. Alinco Life Ins. Co. v. United States, supra note 3, 373 F.2d at 348, 178 Ct.Cl. at 833–35.

21. S.Rep.No.1631, 77th Cong., 2d Sess. 145, 1942–2 C.B. 504, 612.

22. McCoach v. Insurance Co. of North America, 244 U.S. 585, 586, 37 S.Ct. 709, 61 L.Ed.2d 1333 (1917).

23. Massachusetts Protective Ass'n v. United States, 114 F.2d 304, 311 (1st Cir. 1940); see also Maryland Casualty Co. v. United States, 251 U.S. 342, 350, 40 S.Ct. 155, 64 L.Ed. 297 (1920), and S.Rep.No.291, 86th Cong., 1st Sess., reprinted in [1959] U.S.Code Cong. & Admin. News, pp. 1575 at 1577–78.

24. Alinco Life Ins. Co. v. United States, supra note 3, 373 F.2d at 353, 178 Ct.Cl. at 842; Penn Sec. Life Ins. Co. v. United States, supra note 18, 207 Ct.Cl. at 598, 524 F.2d at 1156; Mutual Benefit Life Ins. Co. v. Commissioner, 488 F.2d 1101, 1102 (3d Cir.), cert. denied, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974).

25. 26 U.S.C. § 801 provides:
"(b) Life insurance reserves defined.
"(1) In general.
"For purposes of this part, the term 'life insurance reserves' means amounts—
"(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interests, and
"(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insur-

The denominator of the qualification fraction is the total of all technical insurance reserves (as distinguished from ordinary business liability reserves) and is set forth in section 801(c).[26] Both parties agree that plaintiff's reserves, on its credit life policies, notwithstanding the method of computation, are eligible "total reserves" and must be included in the denominator of the qualification fraction.

To satisfy the definition of life insurance reserves and to be included in the numerator, the amounts reserved on plaintiff's credit life policies must be derived from the following elements:

(1) The amounts are computed or estimated;

(2) The computation or estimation is based on recognized mortality tables and assumed rates of interest;

(3) The amounts are set aside for future unaccrued claims;

(4) Eligible claims must arise from insurance contracts that involve life contingencies; and

(5) The reserves must be required by law.

Plaintiff contends that reserves for its credit life policies, although computed through the gross unearned premium method of computation, for purposes of section 801, are life insurance reserves because they were estimated on a tabular basis.[27] Plaintiff alternatively contends that inasmuch as the reserve actually established on its books and reported in its Annual Statements ex-

ceeded the amounts that would have been computed by the tabular method, plaintiff at least is entitled to treat as reserves the lesser included amount that could be derived from a tabular computation.

Plaintiff points out that the reserves were established to satisfy the provisions of policies which concededly are for life insurance, and which specified that reserves would be computed in accordance with recognized mortality tables and assumed rates of interest. Plaintiff also points out that the estimate was made on a gross unearned premium reserve method for reasons of business convenience and economy; that the method utilized and the amounts so derived were acceptable to the Nebraska Insurance Department; and that the amounts produced were not less than the reserves which would have been computed on the basis of the mortality tables specified in the insurance contracts.

Defendant does not contend that establishing gross unearned premium reserves for credit life policies was improper from a business point of view or from the point of view of state requirements. Defendant's only position is that reserves so computed do not qualify as life insurance reserves under section 801; that reserves so computed constitute "other reserves required by law"; and that the reserves cannot be retroactively recomputed pursuant to methods required for life insurance reserves.

---

**26.** 26 U.S.C. § 801 further provides:

"(c) *Total reserves defined.*

"For purposes of subsection (a), the term 'total reserves' means—

"(1) life insurance reserves,

"(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

"(3) all other insurance reserves required by law.

"The term 'total reserves' does not include deficiency reserves (within the meaning of subsection (b)(4))."

ance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

"(2) * * * in addition to the requirements set forth in paragraph (1), life insurance reserves must be required by law.

   * * * * * *

"(4) *Deficiency reserves excluded.*

"The term 'life insurance reserves' does not include deficiency reserves. * * *

"(5) *Amount of reserves.*

"For purposes of this subsection, subsection (a), and subsection (c), the amount of any reserve (or portion thereof) for any taxable year shall be the mean of such reserve (or portion thereof at the beginning and end of the taxable year." .

**27.** Plaintiff also claims the reserves qualify as life insurance reserves because (1) they were computed on a tabular basis, or (2) they constituted unearned premiums on noncancellable life policies.

In 1942, the Revenue Act was modified to expand the definition of life insurance to include, as qualifying reserves, unearned premiums and unpaid losses on noncancellable health and accident insurance. The purpose of these changes was to benefit life insurance companies and permit additional kinds of reserves to qualify.

When the 1942 amendments were adopted, there was no suggestion that the addition of terms customarily used in casualty insurance was intended to limit or diminish traditional life insurance concepts. The "unearned premiums" and "unpaid losses" were terms added solely to apply to health and accident coverages, not to life policies.[28] The distinction between cancellable-noncancellable policies has significance only in an accident and health insurance context.[29] Accordingly, plaintiff's contention that its credit life policy reserves qualify as unearned premiums on noncancellable life policies has no support in either industry practice or legislative history.

The 1942 expansion of the Internal Revenue Code to include noncancellable health and accident reserves was an effort to adapt to changing industry conditions. At that time, the volume of credit life insurance was of limited significance in the life insurance business. In 1940, with total life insurance in force of $115 billion, credit life insurance amounted to only approximately $380 million, or 0.3 percent. Between 1940 and the end of 1973, the volume of credit life insurance in force increased 263 times from $380 million to $100 billion, and was approximately 5.6 percent of the total $1,778 billion life insurance in force. This phenomenal change was not foreseen in 1942 and the impact of the words used to expand section 801's coverage on this type of life coverage was not contemplated.

Defendant concedes that credit life insurance is life insurance for federal income tax purposes and has abandoned its former position that credit life insurance reserves could not qualify at all because the insurance more closely resembled casualty insurance. Defendant, however, distinguishes credit life insurance reserves from other life insurance reserves in that they apply to short-term policies only. Defendant claims credit life is not "ordinary" life insurance as that term is used in the industry and equates "ordinary" life with "whole" life. Whole life insurance provides for payment on death of the insured without reference to a specified period of years and, where premiums are to be paid throughout the lifetime of the insured, it is referred to as "ordinary," as distinguished from limited payment life.[30] Defendant acknowledges that the term "ordinary life" in use has been broadened to include term policies.[31] Defendant contends, however, that "ordinary life" still primarily covers long-term policies, and that credit life policies, with regard to their duration, resemble only a small portion of the "ordinary" policies.

This distinction is without merit. Credit life insurance policies are comparable to ordinary individual term life insurance contracts that have an equivalent term. The amounts needed to be reserved for each type of life insurance policy would be the same. Ordinary term life insurance, since it is life insurance, cannot be canceled; there is no reason to distinguish credit life insurance in this regard. Credit life insur-

---

**28.** *Alinco Life Ins. Co. v. United States, supra* note 3, 373 F.2d at 352, 178 Ct.Cl. at 841.

**29.** 373 F.2d at 354, 178 Ct.Cl. at 845. This dispute is an example of the ambiguous drafting in the 1942 amendments. Plaintiff contends the word "noncancellable" may apply to life policies and cites in support the structural differences in section 801. Section 801(a) refers to "noncancellable contracts of health and accident insurance"; section 801(a)(2) refers to "noncancellable life, health, or accident policies"; section 801(b)(1)(B) refers to "noncan-

cellable health and accident insurance" contracts. Plaintiff contends that these differences "clearly indicate" that inclusion of the word "life" in "noncancellable life, health, or accident policies" was not merely an accident.

**30.** McGill, *Life Insurance* 58 (rev. ed. 1967).

**31.** Defendant's expert, Robert Zelten, testified that ordinary life insurance included all forms of life insurance other than industrial, group insurance, and credit insurance.

ance is equally "noncancellable," to the extent such a concept has meaning in life insurance, as ordinary term life insurance with an equivalent period. Credit life insurance reserves would have the same components as ordinary term life insurance reserves.

Insurance contract premiums consist of two components—a loading factor and the net, or valuation, premium. The loading factor covers a portion of the insurer's general business expenses and the specific administrative expense anticipated to be incurred in providing the contracted coverage. The size of the loading factor is arbitrarily determined through competitive considerations in the administration of the business. The net premium component is the sum which, actuarially computed on the basis of mortality or morbidity tables and an assumed rate of interest, will be sufficient to provide the benefits guaranteed under the policy.

At any point in a policy year, the annual gross premium may be considered to have an "earned" portion and an "unearned" portion. The terms "unearned premium" and "unearned premium reserves" reflect the liability of the company for premiums collected but not yet earned. Gross unearned premium reserves include a portion of the loading factor, and, consequently, are not limited to calculations designed to compute life, health or accident contingencies. The gross unearned premium reserve includes more than the reserve liabilities on which the contract is based.

In the insurance industry, "reserves" embody concepts that differ from conventional accounting reserves. Insurance reserves are not trust funds or assets in escrow; they are liability accounts that involve no representation that specific assets are held to meet any particular claim or class of claims.[32] Life insurance reserves are liability accounts established in the annual statement to represent the company's potential liability to pay guaranteed benefits on its insurance policies.

The life insurance reserve is a number that is reflected on the company's balance sheet as a liability. It measures the portion of the company's present assets which the company actuarially must assume will be required to meet obligations to policy holders. For this reason, the amount reserved may not be used for other purposes. If it were not recorded as a liability, the company's earnings would be increased and a greater amount of its assets would be available for distribution to stockholders.

A life insurance policy reserve is the excess, at the valuation date, of the present value of future guaranteed benefits over the present value of future net premiums with respect to life insurance policies in force, both of which are determined according to appropriate mortality tables and assumed rates of interest. Insurance reserves are established with respect to policies currently in force for the purpose of paying claims that have not yet been incurred. Life insurance reserves also may be viewed as the accumulation of net premiums at interest in excess of death claims assumed to have been paid out.

A life insurance reserve has two fundamental components: First, the portion (the unearned premium) on a net basis of the amount of the valuation premium collected on the last anniversary date to cover a period which has not expired on the valuation date; second, another portion (the additional reserve) which represents an accumulation from the date the policy was issued through the valuation date of the portions of premium excesses paid in early years, increased by interest and reduced by claims, assumed paid during the interim, for the purpose of meeting premium deficits in later years. The gross unearned premium reserves computed by plaintiff for use with its credit life policies were sufficient to include a net unearned premium and the additional reserve that would have been

---

**32.** *Mutual Benefit Life Ins. Co. v. Commissioner, supra* note 24, 488 F.2d at 1103; *Principles of Life Insurance*, Vol. 1 by J. Greider & W. Beadles (rev. ed. 1972) at 68–71.

computed for ordinary life policies with equivalent periods of coverage.[33]

Nebraska, in common with all states, has a statutory provision that requires the Department of Insurance to "annually value, or cause to be valued, the reserve liabilities (hereinafter called reserves) for all outstanding life insurance policies * * *."[34] The mortality tables which may be used in determining a life insurance reserve are subject to minimum standards imposed by state statutes and the rules and regulations of state insurance departments. The maximum interest rates which may be used are also governed by state statutory and regulatory authorities. An insurance company has a choice of methods in determining its life insurance reserves provided that it follows the guidelines of the state statutes, rules, and regulations setting the minimum standards as to the selection of tables and maximum interest rates. Even using the minimum mortality tables specified in the standard valuation law with regard to ordinary life insurance, it is possible to arrive at 45 different amounts of reserves by varying the interest rates and utilizing three different reserving methods. Moreover, there are an infinite number of reserving methods that could be utilized to arrive at different results.

There is no way to arrive at a single "correct" number for a life insurance reserve. There is no way of knowing, with respect to any policy, if and when the policy benefits ultimately will be payable and how many future premiums and how much future income will be received in the interim.

These contingencies are provided for by assumptions made by the company (1) as to when the persons insured are likely to die and (2) the rate at which investment income may accrue. These assumptions are based, respectively, on tables of mortality and assumed rates of interest. The variety of assumptions and calculations permissible under the state statutes and regulations is extensive. Insurance companies are free to pick and choose, in accordance with business dictates, among these various variations, subject only to the requirement that the selected method does not produce a reserve which, in the judgment of the regulatory authorities, is unreasonably low or that an unreasonably high assumption is not made as to the amounts that will be provided out of future premiums and future investment income. Every company's life reserve basically is only an estimate which can be arrived at by a wide variety of ways.

Life insurance companies are required to report aggregate life insurance reserves in exhibit 8 of the Annual Statement. The two fundamental components of a life insurance reserve (the net unearned premium and the additional reserve) are not separately stated in exhibit 8. Exhibit 8 is divided into various sections in which the life insurance company reports reserves held with respect to its various life insurance and annuity coverages and which, with respect to certain additional benefits (including certain disability benefits), are written as part of, or in conjunction with, its life insurance coverages. The reserves

---

**33.** Mr. Arthur Crooks Eddy, plaintiff's expert witness, testified:

"So, theoretically and conceptually, if you are earning your premium on the basis of the sum of the digits then you are realizing the premium too rapidly to cover the risk in the latter part of the period of coverage and should reserve or save back some portion of the net premiums realized in the earlier periods to offset the inadequacy in the proportionate part of the release of the gross premium being the net premiums in the future. Therefore, conceptually you have the reserve requirement which calculated by a different manner, that is calculated using tabular factors applied to the amount of insurance on a declining balance, would give the same results as I have described

by adding components 1 and 2, calculated as I have just described, also.

"So, in the underlying reserve requirement there is a minimum on a mortality basis permitted and at an interest rate permitted would have these component parts which would become some percentage of the gross unearned premiums. And it is determined in Plaintiff's Exhibit 13 the average ratio of the net premium or the net mortality factor to the gross premium charged during that period of time was, that is, 1963 to 1964, was on the average seventy and one-half percent of the gross unearned premium."

**34.** Neb.Rev.Stat. § 44–402 (1943).

reported in exhibit 8 of the Annual Statement have in common the fact that they all involve probabilities, either mortality or morbidity, and interest discount factors.

Liabilities for life insurance claims which are outstanding or which have accrued as of the valuation date, including estimates of claims which have accrued but which have not been reported to the company as of the subject date, are reported in exhibit 11 of the Annual Statement. Unlike insurance reserves reported in exhibit 8, the amounts reported in exhibit 11 have no probabilities or interest discount factors, but are fully accrued and payable as of the valuation date.

Accident and health insurance, accident and sickness insurance, and disability insurance are synonymous terms as to benefits payable. The benefit is payable as the result of disablement, whether occasioned by accident or sickness. The term "disability insurance" generally signifies that the coverage is written as a rider to a basic policy. The terms "accident and health insurance" and "accident and sickness insurance" signify that the coverage is written as a separate policy. Reserves for accident and health insurance issued separately from life coverages are not reported in the Annual Statement in the same manner as life insurance reserves.

Reserves and accident and health insurance benefits that are issued separately from life coverages are reported on exhibit 9 of the Annual Statement. Disability provisions issued in conjunction with short-term life coverages may be reported in exhibit 8 or in exhibit 9.

Exhibit 9 was added to the life insurance company's Annual Statement subsequent to the late 1930's. It was derived from the fire and casualty insurance company statements in which life companies had previously reported their accident and health business. The report of unearned premiums on a gross basis that includes a loading element is a holdover from the fire and casualty insurance company's statement from which exhibit 9 was derived.

Exhibit 9 is divided into two parts: Part 1 sets forth reserves representing future unaccrued liabilities, and part 2, in general, sets forth claims that have become fully accrued and payable as of the valuation date. Part 1 of exhibit 9 involves probabilities, based on morbidity tables and interest discount factors, relative to accident and health reserves, and reserves there reported are comparable, in general, to life insurance reserves reported in exhibit 8. Part 2 of exhibit 9 has no counterpart in exhibit 8, but is analogous to the liabilities for fully accrued and payable life claims reported in exhibit 11.

Part 1 of exhibit 9 has two divisions that permits the unearned premium component and the additional reserve component to be reported separately. Line 1 of part 1 sets forth the unearned premium reserve on a gross basis that includes both a loading element and a morbidity element. Cancellable health and accident policies have only the gross unearned premium reserve reported on line 1. The computation of the gross unearned premiums shown on line 1 of part 1 does not involve direct application of mortality or morbidity factors and interests discounts; it is a pro rata portion of the contract premium that reflects the fact that only a portion of the policy year has expired. Tabular factors are reflected only indirectly from the fact that when the original premium was constructed, the tabular factors, plus other considerations, were involved.

Line 2 of exhibit 9's part 1 sets forth the additional reserve for level premium, guaranteed renewable accident and health policies. This reserve provides for an accumulation of premiums that are in excess of those required on a net basis in the early years of coverage, where the accumulation is held for premium deficits in the later years. The reserve reported on line 2 of part 1 is exactly comparable to the additional reserve component of a life insurance reserve.

The additional reserve component reported on line 2 of part 1 takes into account the increase in mortality or morbidity risk over

the term of the policy when the premium remains level. Plaintiff's expert asserted that an actuary computing premiums on a 2-year accident and health policy would take into account the increasing risk over the 2-year period in constructing a single premium contract, or a contract that called for two level premiums. Where the term is short, however, the additional reserve component is not required to be separately stated since the excess of the gross unearned premium reserve over its morbidity element normally would be sufficient to cover the increasing mortality or morbidity risk.

Defendant contends that the dollar numbers reported as reserves for plaintiff's credit life policies are not eligible for inclusion in the numerator of the qualification fraction because the state regulatory authorities could not verify at the time of the annual or triennial examinations that the amounts reported had been computed on a tabular basis. Suffice it to note that plaintiff's reserves for its credit life policies were acceptable at the annual and triennial examinations.[35] At the time of the examinations, the state officials knew that the credit life reserves were computed by the gross unearned premium reserve method. In these examinations, the examiners are obligated to assure that the reserved amounts are sufficient to fund the risk involved and must test their adequacy for that purpose. The amount of risk involved is determined on the basis of morbidity and mortality tables. The adequacy of the amounts reserved is tested through the use of mortality and morbidity factors.

Irrespective of the method used to compute the life insurance reserve, the end result is a specific dollar number, identified for the purposes for which the reserve is required. This amount is carried in the company's records and reported in its Annual Statements as the life insurance reserve required by statute and regulation. In this case, plaintiff's 1963 and 1964 Annual Statements reflected that the reserves here in question for its credit life insurance policies were included in exhibit 8, subsection A, and were based upon the American Experience Table of Mortality with 2½ percent net level interest. The dollar amount reported for the credit life reserves totaled $1,260,950 for 1963 and $1,324,182 for 1964.[36] These amounts were the amounts that were designated as its insurance reserves for its credit life policies.

Section 801(b) permits a life insurance reserve to be an amount "computed or estimated." The use of alternative descriptions of the method by which an acceptable reserve may be determined has historical recognition.[37] Each term was purposefully included and each is to be given meaning. "Computed" signifies a more precise methodology and a more exact mathematical calculation. "Estimated" permits greater flexibility in method and reasonable approximations in the result.

Plaintiff supports its contention that its credit life reserves were estimated tabular reserves on two grounds. First, according to plaintiff's expert, in constructing the contract premium in the first instance, the actuary must take into account mortality and morbidity factors and interest discounts. Since the gross unearned premium reserve is derived from the original contract premium, the reserve involves an indirect application of the tabular factors. If the gross unearned premium reserve were less than would be required by the tabular factors, an additional reserve equal at least to the deficiency would have to be set up. In this way, the actuary is required to take into account the tabular factors in constructing the contract premium and, therefore, the tabular factors are underlying ele-

---

**35.** Minor adjustments were made by the triennial examiners to move certain health and accident reserves from exhibit 8 to part 1 of exhibit 9.

**36.** The actual entries in exhibit 8 of the Annual Statement for 1963, with respect to the American Experience Table of Mortality, totaled $1,309,297.83, and, in 1964, the total was $1,403,865.30. These amounts have been adjusted in the stipulation to reflect reinsurance ceded, as set forth on line 26 of exhibit A of the district director's 90-day letter of June 27, 1968.

**37.** *General Life Ins. Co. v. Commissioner*, 137 F.2d 185, 189 (5th Cir. 1943).

ments of the gross unearned premium reserve.

Although the tabular factors thus may be said to underlie the gross unearned premium reserve, it does not follow that the reserve itself is "estimated on the basis of" the tabular factors. In the estimating process, the reserve is not derived from a direct application of mortality and morbidity factors and interest discounts.

For its second ground in support of the claim that the reserve is "estimated," plaintiff asserts it used the unearned premium method of computation for its credit life policy reserves as a means to approximate the reserves which would have been produced through the use of precise calculations based on recognized mortality tables. On this ground, plaintiff's contention has merit and its credit life reserves can be said to be "estimated on the basis of" the tabular factors.

Plaintiff, at trial, introduced evidence to compare the amounts of reserves that were computed on the gross unearned premium method to the amounts of reserves that would be computed directly on the tabular method. This comparison was based upon plaintiff's policies in force in 1963 and in 1964 which were issued subsequent to December 31, 1959. The policies involved in the comparison accounted for over 90 percent of the total unearned premiums attributable to the total insurance in force. Computation of the hypothetical tabular mortality reserve in the comparison was on the basis of 130 percent of the amount derived from the appropriate mortality table.

In this comparison, plaintiff's computation of the hypothetical tabular mortality reserve utilized the mortality table appropriate to the particular policy. Each policy prescribed the use of one of three mortality tables: 1941 C.S.O., 1958 C.S.O., or American Experience. Although all of plaintiff's unearned premium reserves on both credit individual term and credit group life insurance were reported in the Annual Statements under the label "American Experience," not all such policies in effect would have been subject to the American Experi-

ence table in 1963 and in 1964. In 1963, plaintiff had no policies in force subject to the American Experience table.

Plaintiff's comparison shows that, in fact, credit life policy reserves computed on the gross unearned premium method are reasonably approximate to reserves that would have been computed on the basis of the appropriate mortality tables. With respect to the policies in force in 1964 that were subject to the American Experience Table of Mortality, plaintiff's comparisons show that its decreasing term policies required tabular reserves of $1,490.24 when computed at 130 percent of the table, and the gross unearned premium reserves for those policies would be $1,477.79. Level term policies subject to the American Experience table in 1964 required tabular reserves of $565.12, when computed at 130 percent of the table, and the gross unearned premium reserves for those policies would be $612.42.

In 1963, the total tabular mortality reserves that would have been required at 130 percent of the appropriate table for the policies involved in the comparison would have been $950,257.41; plaintiff's gross unearned premium reserves on those policies would have been $1,415,281.76. In 1964, the comparison policies would have required total tabular mortality reserves in the amount of $944,953.27; plaintiff's gross unearned premium reserves on those policies for 1964 would have been $1,281,203.52.

Since the policies for which computerized data was available represented only about 90 percent of the total unearned premiums for all policies in force, an adjustment was made in plaintiff's comparison. The ratios of the tabular mortality reserves to the unearned premium reserves on the tabulated policies were applied to the unearned premium reserves on all credit life policies and tabular mortality reserves on all credit life policies were thus derived. After the adjustment, tabular mortality reserves which would have been required for plaintiff's credit life policies for 1963–64 were calculated to be in the mean amount of $911,010. The total gross unearned premium reserves reported by plaintiff for its

credit life insurance policies for these years were in the mean amount of $1,292,566.

Defendant contends that the dollar amount ($1,292,566) of the gross unearned premium reserve that plaintiff reported is not a close approximation of the tabular reserve that would have been required in 1964. Defendant also asserts that plaintiff may not use the Illinois standard that permits credit life reserves be based on 130 percent of the appropriate mortality table. Defendant asserts that the gross unearned premium reserves plaintiff reported were approximately 184 percent of the amount the tabular reserve would have been if computed at 100 percent rather than at 130 percent of the appropriate mortality table.

The Illinois Insurance Department's directive that authorized use of the 130 percent factor was to all insurance companies writing credit life insurance in Illinois and was not limited in scope to business written in Illinois. Plaintiff is permitted to use the highest aggregate reserve requirement of any state in which it transacts business for the purpose of computing its reserves. This principle is incorporated in Treasury regulations insofar as it affects computation of total reserves.[38] Accordingly, in 1964, plaintiff was required, with respect to its Illinois business, to compute its credit life reserves on the basis of 130 percent of the appropriate mortality table. Plaintiff's use of the 130 percent factor in its computation of hypothetical tabular reserves as a basis for comparison with its gross unpaid premium reserve was appropriate.

The dollar amounts that plaintiff reported as its credit life reserves were reasonably approximate to the amounts that would have been derived from computations from the appropriate mortality tables.

The amounts reported satisfy the requirement that the reserve be estimated on a tabular basis. In any event, the dollar amount of reserves established by plaintiff on its credit life policies included the lesser amount which would have been derived from a computation based upon 130 percent of the appropriate table, which, when included in the numerator of the qualification fraction, would also confirm plaintiff's status as a life insurance company in 1964.

On the basis of the foregoing, plaintiff's reserves on its credit life policies satisfy the requirements of the statutory definition in section 801(b). Other reserve items are in dispute, and the parties have briefed their respective positions thereon. As to these other items, decision has been requested to resolve status questions for years not now pending before the court. Inasmuch as disposition of the credit life reserve question resolves plaintiff's status as a life insurance company for purposes of this case, no decision is made on the other items in dispute.

---

**38.** Treas.Reg. § 1.801–5(a)(3) states, in part:

"The term 'total reserves' does not, however, include deficiency reserves (within the meaning of section 801(b)(4) and paragraph (e)(4) of § 1.801–4), even though such deficiency reserves are required by State law. In determining total reserves, a company is permitted to make use of the highest aggregate reserve required by any State or Territory or the District of Columbia in which it transacts business, but the reserve must have been actually held during the taxable year for which the reserve is claimed. * * *"

*See also Continental Ins. Co. v. United States,* 474 F.2d 661, 668, 200 Ct.Cl. 552, 564–65 (1973), where the court states:

" * * * Courts have explicitly recognized that, for federal tax purposes, state rules on reserves apply across the board to all of a company's business, in the same way that such rules are applied by the states themselves. * * *"